[File No. 6189.]

STATE EX REL. HARRY C. CLEVERINGA, Respondent, v. E. M. KLEIN, as Sheriff of Emmons County, North Dakota, Appellant.

(249 N. W. 118, 86 A.L.R. 1523.)

516

Opinion filed June 12, 1933.

*Coventry & Thompson* and *George F. Shafer,* of counsel for respondent.

*Thurman Wright* and *C. F. Kelsch,* of counsel for appellant.

BURR, J.    The sole issue in this case is the scope and effect of Senate Bill No. 2 known as Chapter 157 of the Session Laws of 1933 providing for "Extension Redemption real estate mortgage foreclosure."

One Baumgartner was indebted to the petitioner in the sum of $2,000. To secure the payment of said amount Baumgartner and wife, on August 23, 1928, executed and delivered to the petitioner a mortgage upon the southeast quarter of section 35 of township 132, range 76, in Emmons county. In the instrument they covenanted to pay interest on said sum annually at the rate of six per cent, to pay the taxes, and further, that if default were made in any of the agreements petitioner could declare the whole sum due and payable and was authorized and empowered to sell the premises, "agreeably to the statute in such case made and provided," and "in case of the foreclosure of this mortgage" they would pay the "costs allowed in that behalf by law."

Default was made in the payment of interest and taxes, and on February 27, 1932, the mortgage was foreclosed and the premises sold to the petitioner for the sum of $2,289.52.

The defendant in this case is the sheriff of Emmons county. February 27, 1932, he issued to the petitioner his certificate of mortgage sale, which certificate states "that the purchaser will be entitled to a deed of said premises so sold at the expiration of one year from the date of sale unless such premises are previously redeemed as provided by law." No redemption was made and at the expiration of the period of redemption petitioner demanded of the sheriff that he execute a sheriff's deed, and tendered to the sheriff the certificate of sale and such sums as were necessary for the execution of the deed, which demand the sheriff refused.

On March 11, 1933, the petitioner applied to the district court for a writ of mandamus setting forth the facts hereinbefore stated.

The defendant answered admitting all the aforementioned facts and also that "such foreclosure sale was in all things valid and regular," but alleged that because of the provisions of the aforesaid law the "period of redemption in mortgage foreclosure sales was extended for a period of two years; that such law provided that it should become immediately effective, and that acting under and by virtue of said law, this defendant has refused to execute a deed as demanded by the petitioner herein, and not otherwise."

Upon the hearing the court issued a peremptory writ of mandamus requiring the defendant to execute the sheriff's deed.

From the order granting the peremptory writ and from the judgment and writ the defendant has appealed, alleging that the court erred in ordering the writ to issue.

This Act is as follows:

"An Act Temporarily Extending the Time in Which Redemption May be Made From Real Estate Mortgage Foreclosure, and Real Estate Execution Sales.

"BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF THE STATE OF NORTH DAKOTA:

"Section 1. That whereas a public emergency and crisis exists throughout this state endangering the public health, welfare and morals, in that agricultural crops and products have been sold on an average below the cost of production since 1922, and all agricultural land values have virtually disappeared, due to the nation wide depression, which caused underconsumption and produced starving millions throughout the nation; and whereas taxes have been steadily increasing in spite of the deplorable condition of agriculture, and whereas agriculture is the principal industry in this state and all other industries are solely dependent for their existence upon agriculture; and whereas there is at present no means whatsoever by which existing mortgages and judgments can be refinanced, and such debtors are at the absolute mercy of their creditors; and whereas hundreds and thousands of families have already lost their homes through mortgage foreclosures or other judicial proceedings; and whereas hundreds and thousands more will lose their homes unless some relief is given, therefore in order to prevent the utter ruin and destruction of agriculture, commerce and industry and the collapse of civil government, and in order to maintain the integrity of the family and the home, and the public health, welfare, and morals of the people of this state, the period within which a mortgage or judgment debtor may redeem from a foreclosure sale or an execution sale of real estate hereafter made, is hereby extended from one year to two years from the date of such sale.

"Section 2. That the period within which a mortgage or judgment debtor may redeem from a mortgage foreclosure or execution sale of real estate, but for which deed has not been issued, is hereby extended for a period of two years from the date of the passage and approval of this act.

"Section 3. That the Legislature does hereby declare that this act is passed under the police power of the state for the reasons and purposes herein stated, and requests that the courts construe all of its provisions liberally, with a view of carrying out the purposes herein stated.

"Section 4. SAVING CLAUSE. It is hereby declared that if any of the provisions of this act in any manner contravenes the provisions of the Constitution, the remaining provisions would have been enacted by this Legislative Assembly even though such provisions had been eliminated from the act; hence, if any of the provisions are found to be violative of the Constitution, the remaining provisions shall not be affected by such invalidity, but shall remain in full force and effect.

"Section 5. EMERGENCY. This act is hereby declared to be an emergency measure and shall take effect and be in force for a period of two years only from and after its passage and approval, and the period within which a mortgage or execution debtor may redeem real estate from a sale thereafter made shall be governed by the laws now in effect.

"Approved February 21, 1933."

In this case petitioner has assumed the burden of showing that the law in question does not govern the foreclosure sale involved. In support of his position petitioner urges that this law, "being a statute of a general nature, does not have a uniform operation" and therefore violates § 11 of the state Constitution; that it deprives him of his property "without due process of law" and therefore violates § 13 of the Constitution of this state and § 1 of the Fourteenth Amendment of the Constitution of the United States; that it "impairs the obligations of contract," and therefore violates § 16 of the state Constitution and § 10 of article 1 of the Constitution of the United States; and that it grants privileges to a certain class of citizens which are not granted to other citizens upon the same terms, in this that as against certain creditors the law gives "all mortgage or judgment debtors whose real estate may be sold on a foreclosure or execution sale after the passage and approval of the statute," two years from the date of the sale in which to redeem; whereas against other creditors, such as the plaintiff, the law gives the "mortgagor or judgment debtor, whose real estate has been sold on foreclosure or execution sale prior to the passage of such

statute, but for which deed has not been issued," an additional *"period of two years from the date of the passage and approval of the Act"* for redemption "in addition to such period of redemption already enjoyed by such mortgagor or judgment debtor," on the foreclosure already had, and therefore violates § 20 of the state Constitution.

Petitioner contends that if this law extends the period of redemption from the foreclosure involved herein it impairs the obligations of the contract involved; that the contract of mortgage was executed at a time when the period of redemption was but one year and that this was part of the contract entered into between the mortgagor and mortgagee.

It is well settled "that the laws which subsist at the time and place of the making of a contract, . . . enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." Blakemore v. Cooper, 15 N. D. 5, 14, 106 N. W. 566, 4 L.R.A.(N.S.) 1074, 125 Am. St. Rep. 574. The foregoing statement is a quotation from the decision of the Supreme Court of the United States found in Von Hoffman v. Quincy, 4 Wall. 535, 18 L. ed. 403.

The obligations of a contract are determined by the law in force when it is made, since existing statutes enter into obligations by implication. People ex rel. New York v. Nixon, 229 N. Y. 356, 128 N. E. 245.

For this reason this court, in numerous cases has held that statutes forbidding certain things, or granting certain privileges are part of the contract entered into between parties even if no reference be made thereto. For example, we have held time and again that such statutes as the one giving to a purchaser of farm machinery a reasonable time in which to test the machinery is a part of the contract even though no such provision is contained therein. See Minneapolis Steel & Machinery Co. v. Casey Land Agency, 51 N. D. 832, 201 N. W. 172; Minneapolis Threshing Mach. Co. v. Hocking, 54 N. D. 559, 209 N. W. 996; Allis-Chalmers Mfg. Co. v. Frank, 57 N. D. 295, 221 N. W. 75; Fuller v. Fried, 57 N. D. 824, 224 N. W. 668; Hamman v. Advance-Rumely Thresher Co. 61 N. D. 505, 510, 238 N. W. 700.

The rights of parties to a transaction are determined by the law in force at the time of the contract and can not be altered either by subsequent legislation or judicial decision. Schaffner v. Young, 10 N. D. 245, 249, 86 N. W. 733. See also Conrad v. Smith, 6 N. D. 337, 70

N. W. 815. Many other instances can be cited showing it to be the uniform holding of this court that the law affecting the subject matter involved in the contract is part of the contract and the parties are presumed to have contracted with this law in view, and to have adopted it, and this is the rule in all the states.

That the statutory period of redemption is part of the contract is beyond question. The matter has been before this court in another form. In First Nat. Bank v. Bovey, Shute & Jackson, 49 N. D. 450, 191 N. W. 765, it was determined that a purchaser at a sale on the foreclosure of a mortgage executed at the time the law gave to the purchaser at the sale the rents and profits during the period of redemption, was not affected by the new law which gave to the mortgagor the rents and profits during the period of redemption; that the latter law could not apply to contracts executed under the old law, otherwise it would impair the obligations of contract. The same principle was announced in Lander & Co. v. Deemy, 46 N. D. 273, 176 N. W. 922, where it was applied to the law extending the period of redemption after the notice of the cancelation of a contract for the sale of land.

The Supreme Court of the United States has in numerous cases held "that the law in force at the time the mortgage is executed with all the conditions and limitations it imposes, is the law which determines the force and effect of a mortgage." The same court holds that whatever changes may be made in a law so as to affect the substance of the rights of either party to the contract impair the obligations of the contract. See Von Hoffman v. Quincy, 4 Wall. 535, 18 L. ed. 403; Brine v. Hartford F. Ins. Co. 96 U. S. 627, 636, 24 L. ed. 858, 862; Barnitz v. Beverly, 163 U. S. 118, 41 L. ed. 93, 16 S. Ct. 1042; Bradley v. Lightcap, 195 U. S. 1, 49 L. ed. 65, 24 S. Ct. 748. Thus a statute which, after the mortgage has been executed, cuts off the mortgagor's right of redemption, or shortens the period of redemption, is a law which impairs the obligation of a contract as completely and extensively as does a law which extends the period of redemption. The Supreme Court of the United States in Barnitz v. Beverly, and Bradley v. Lightcap, supra; and Howard v. Bugbee, 24 How. 461, 16 L. ed. 753, holds expressly that a statute which extends the period of redemption, or gives a right of redemption where no such right previously existed, impairs the obligations of a contract executed before the passage of the

law. In the latter case the legislature of Alabama extended the time of redemption to two years; the supreme court of Alabama upheld the law as applicable to mortgages executed prior to the passage of the law, but.the Supreme Court of.the United States held such application was prohibited by the provision against impairing the obligations of contracts and the law could not govern mortgages executed prior to its passage.

Such law need not necessarily strike down all the obligations of the contract or any special obligation. It is "impairment" of the contract which is involved. As pointed out in First Nat. Bank v. Bovey, Shute & Jackson, 49 N. D. 450, 191 N. W. 765, supra, the term "impair" means diminish in value or excellence or strength. See also Swinburne v. Mills, 17 Wash. 611, 50 Pac. 489, 61 Am. St. Rep. 932, where it was held that a law, enacted after the mortgage was given, required the judgment creditor to wait a year before making a sale, whereas the law in force at the time the mortgage was given gave him the right of sale immediately, impaired the obligations of contracts and was void as to this foreclosure.

In Sturgis v. Crowninshield, 4 Wheat. 122, 4 L. ed. 529, the Supreme Court of the United States held that the bankruptcy law of New York, which purported to discharge the contract of debt contracted prior to its passage, impaired the obligations of the contract and was void to that extent. And later in Ogden v. Saunders, 12 Wheat. 213, 6 L. ed. 606, reaffirmed the rule, but held that this rule of impairment did not apply to debts contracted after the passage of the act.

It is clear that this law, so far as it is attempted to be applied to mortgages executed prior to its passage, does impair the obligations of the contract.

Petitioner says that if this law be applicable to the case at bar it deprives him of property without due process of law. If the purchaser be entitled to a deed to the premises and to the possession thereof at the expiration of the year for redemption—and the pleadings in this case admit that the appellant was entitled to a deed on Feb. 28, 1933,— then he is deprived of his property during the years 1933 and 1934; he is denied the use, benefit, and income therefrom and the rents and profits for this additional two years. The present occupant is not required to pay rent, interest or taxes. There is no provision in the

law anywhere whereby adjustment of rights may be made, as we find in the New York law under consideration by the Supreme Court of the United States in Edgar A. Levy Leasing Co. v. Siegel, 258 U. S. 241, 66 L. ed. 595, 42 S. Ct. 289, and Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 65 L. ed. 877, 41 S. Ct. 465, where the party owning the premises was assured the reasonable rent for his property or its possession for his own use. The use and benefit, and the rents and profits of the land involved are taken from the new owner and given to another without any legal process or the determination of any court or competent tribunal whatever. There can be no question but what the owner is deprived of his property without due process of law if this law is applicable to foreclosure of mortgages made prior to its enactment.

It is true that a mere change in the rules of evidence, or even at times in the method of determination of rights does not necessarily impair the obligations of a contract nor deprive a person of the property without due process of law. As said in Neer v. State Live Stock Sanitary Bd. 40 N. D. 340, 168 N. W. 601, 18 N. C. C. A. 1:

"What is, and what is not, due process of law depends upon the circumstances, and the constitutional provisions which provide for a preliminary court procedure are often held to have no application to statutes which are passed in the exercise of the so-called police power of the state."

It is also true that a mere change in remedy does not necessarily impair the obligations of a contract. A change in the method of enforcement, which does not increase or diminish substantially the obligations involved and which affords an adequate remedy in lieu of the one previously in force may not so affect a contract. But the statutory provisions under review are not concerned with a remedy for the enforcement of a right. They affect the right itself. They do not even offer adequate compensation for the right taken, or any compensation at all.

The right to unlimited use of certain property may be curtailed at times, as by zoning laws. Laws which prevent the killing of game, even in cases where the game may be destroying property, and innumerable other instances show proper exercise of the police power in subordinat-

ing unlimited use of property or damage to property to public policy. But unless justified by a proper exercise of the police power it is clear that this law does deprive the purchaser of his property without process of law.

Petitioner says that this law, if applied to him, creates to his detriment two classes of citizens, making it possible in his case that the mortgagor have practically three years in which to redeem whereas with reference to a mortgage foreclosure from now on the mortgagor has but two years in which to redeem. In other words, that this two years for redemption granted in the case at bar does not take into consideration the period of redemption already entitled.

The whole act, from the title to the emergency clause inclusive, is intended to be temporary. The purpose is clearly expressed. The law is intended to govern the period from February 21, 1933, to February 21, 1935. Except so far as necessarily repealed because of provisions in this law, existing laws are not repealed. The emergency clause indicates clearly a temporary suspension of the general or usual provision giving one year for redemption and it is the plain purpose of this law that after February 21, 1935 redemptions must be made within one year. It is true that under the provision of § 1 of the act in case of a foreclosure made after the approval of the measure the mortgagor is given "two years from the date of such sale;" but this is limited by the provisions in § 5 so that a redemption from a sale made in June, 1934, would not be extended for two years. It is also true that in such case as the mortgage sale under consideration the mortgagor was given, by § 2 of the act, until February 28, 1935 to redeem, and therefore it would appear that the mortgagor involved has practically three years to redeem despite the law in force at the time the mortgage was made. But we need not determine whether article 20 of the constitution, which says that no citizen nor class of citizens shall "be granted privileges or immunities which upon the same terms shall not be granted to all citizens" is applicable to this case.

No serious attempt is made to deny that this law if applicable to the case at bar impairs obligations of contract and deprives the owner of his property without due process of law; but the law is justified on the ground that it is a valid exercise of the police power of the state, for temporary purposes and in the face of a great emergency.

An examination of the Constitution of this state shows certain limitations upon the power of the Legislature.

Article 1 of the state Constitution consists of twenty-four sections and is known as the "Declaration of Rights." These sections deal with the rights of the individual; to enjoy and defend life and liberty; to alter and reform the government "whenever the public good may require;" to remain an inseparable part of the American union; to enjoy the free exercise of religious profession and worship; to be entitled to the privilege of the writ of habeas corpus which is not to be suspended "unless when in case of rebellion or invasion, the public safety may require;" to give bail when charged with criminal offense; to trial by jury, and to be free from star chamber processes; to free speech and free assembly and equality in standing before the law; to the subordination of the military to the civil power and to the assistance of the state in his defense; to be certain he shall not twice be "put in jeopardy for the same offense, nor be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property without due process of law;" to possess and enjoy his own private property which shall not be taken from him or "damaged for public use without just compensation having been first made to, or paid into court" for him; to be free from imprisonment for debts; to be secure in his person and home and in his papers and effects against any unreasonable searches and seizures; to be free to obtain employment; to be certain that "no bill of attainder, ex post facto law, or law impairing the obligations of contracts shall ever be passed;" to be certain that "all laws of a general nature shall have a uniform operation" and to know that "no special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens."

To make more certain that these inalienable rights are secured to everyone, under all circumstances and under all crises, the people of this State said in § 21:

"The provisions of this constitution are mandatory and prohibitory unless, by express words, they are declared to be otherwise;" and in § 24:

"To guard against transgressions of the high powers which we have

delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate."

It is clear from this recital that there are some things which the people of this state have specifically forbidden the legislature of this State to do. No matter what the emergency may be—the people, in their wisdom, have deliberately limited the power of its agents known as the legislature. Whether this be wise or unwise; whether it may now be said that the people at the time of the adoption of the Constitution could not foresee the emergency which exists are matters of judgment for the people themselves to determine in any movement to alter or change these provisions. Until so changed they are constitutional limitations on the power of the legislature—the members of which took an oath to support this Constitution, with all of its provisions, as well as to support the Constitution of the United States.

The police power is "the power to prescribe the regulations to promote the health, peace, morals, education and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity." Barbier v. Connolly, 113 U. S. 27, 28 L. ed. 923, 5 S. Ct. 357.

It is clear from the law that the legislature, in the enactment of the statute under consideration, was endeavoring to grapple with a grave social emergency confronting the people of this state, an emergency which, in the opinion of the law-making body of the state had become a menace to the public health, peace and comfort of the state. That the emergency, as it affected this state, was but a reflection of a grave social condition, world-wide in its application, and that the effects therefrom differed in intensity and threat in accordance with stress of conditions in different localities, states and nations, and, further, that matters of public knowledge might justify the legislature in believing the situation more acute in other portions of the nation did not preclude the legislature from attempting to alleviate by emergency measures a condition which the people of this State in general recognized and which gave every evidence of greater strain and threat. In times of grave state danger, whether it be an isolated case or shared with the country at large, the legislature is charged with the duty of maintaining government and at times the ordinary rights of individuals may be suspended temporarily in order that government may endure. The

police power of the state may be invoked at times to maintain existing conditions temporarily when the life of the state is threatened; but the exercise of this power is not confined to those extremely rare cases when the existence of the state itself is threatened. In times of war interference with the rights of the citizens may be justified, unless the state itself has absolutely forbidden the legislature to exercise such powers, or unless a higher power forbids. That the certain rights of the individual may be invaded in time of great emergency is shown by the case of Block v. Hirsh, 256 U. S. 135, 65 L. ed. 865, 41 S. Ct. 458, 16 A.L.R. 165, wherein the Supreme Court of the United States sustained the Act of Congress enacted for the same general purposes. The same court in Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 65 L. ed. 877, 41 S. Ct. 465, upheld the Act of the legislature of New York in suspending for a period of two years "the right to recover possession of real property occupied for dwelling purposes, except where the person holding over is objectionable, or where the landlord seeks to occupy the premises as a dwelling for himself and his family, etc." Also Edgar A. Levy Leasing Co. v. Siegel, 258 U. S. 241, 66 L. ed. 595, 42 S. Ct. 289, which upheld the Act of the legislature of New York in preventing the eviction of tenants after the expiration of their contracts and upon certain conditions which amply protected the rights of the landlord and read into future leases the law enacted at that time. These measures were held justified because of the great national emergency caused by the world war; but even then four of the nine members of the court considered the law absolutely unconstitutional, regardless of the safeguards enacted for the protection of the owner.

But armed conflict between nations is not necessarily the only national or state emergency which calls for the drastic exercise of the police power. It is perfectly possible that an emergency which arises because of the aftermath of war may be as serious a menace to the peace, comfort and public order of the state as is the war itself. There is no difference in principle; the difference if any being in the acuteness of the emergency.

In § 1 of the Bill under consideration the legislature pronounced its deliberate judgment to the effect that the State was in the midst of a great social emergency. While the opinion of the legislature, in itself alone, does not necessarily prove that such emergency exists in fact,

nevertheless its declaration is entitled to great respect. This court takes judicial notice of the situation which confronted the state at the time of the enactment of this law; the effect upon the integrity of the family and the home, upon the basic industry of the State, and even upon the integrity of the State itself through the tendency to resistance, the loss of revenue for the maintenance of government, and other factors which are essential to peace and order. This leads us to the conclusion that the legislature had sound bases for determining an emergency existed, and therefore could adopt measures to safeguard against it— within the limits made by the people themselves and expressed in the constitution.

That the relation between debtor and creditor in the redemption of homes is such an emergency as may be so affected by a public interest as to render it subject to proper regulation by the exercise of the police power is a matter primarily for the legislature to determine. Hence it is not only the province, but the duty of the legislature to attempt to deal with such conditions so as to promote the best interests of the state, and, unless the legislature itself is specifically prohibited from dealing with such emergency in the manner attempted, its judgment as to the necessity becomes ours.

The emergency which the legislature seeks to control or mitigate by this act is dealing primarily with the effect upon agriculture, and agricultural lands and products. It is clear from § 1 that the law is concerned primarily with farm lands and with that in view the law is enacted "in order to prevent the utter ruin and destruction of agriculture, commerce and industry."

While the issue is not directly involved it is suggested that uncertainty and confusion are bound to arise if the act under consideration is held not to apply to mortgages executed prior to its approval, and thus injustice result to mortgagors and their tenants who remained in possession and planted crops in reliance on this law.

We take judicial notice of the fact that agriculture is the basic industry of the state; that the nature and character of the crops, the method of farming, climatic conditions and other factors combine to make spring the time for seeding; that a large portion of the expense of farming is incurred in that period; that because of the enactment of this measure and the official declarations which followed prudent

men placed confidence in these acts and declarations, and thus a large percentage of our people have proceeded on the theory that all foreclosures are governed by this act.

Thus a grave situation is presented, and we deem it not only proper but also necessary to indicate how this is to be solved. Courts exist for the protection of rights. The citizen has a right to place confidence in the act of the legislature or declaration of state officials acting generally along the lines supposedly included within the scope of the position held. Where, under such conditions, men in good faith have proceeded to sow crops, they are justified in placing confidence in legislative and executive declarations and the courts of the state have ample equitable powers to protect the rights of such people in order to prevent injustice and the destruction of that faith and confidence which the public have a right to place in its own institutions, and in the officers selected for legislation and enforcement. Hence we deem it timely to point to relief of the grave consequences which could follow unreasonable and unjust emphasis upon certain features involved to the exclusion of others. The courts of this state have always been open and have steadfastly stood for the redress of wrongs and the protection of rights. The humblest and least influential citizen has a right to a feeling of security that where he has acted in good faith and in reliance upon constituted authority he will not be permitted to suffer because in the time of a great emergency the legislature and the executive departments have exercised powers by them deemed necessary to meet the situation, particularly in a state where the legislative power is all comprehensive in the people except so far as they have deemed it wise and necessary to limit themselves.

Mortgagors and their tenants who remained in possession under the provisions of this law and the declarations of public officials are not trespassers. They have equitable rights in crops planted by their labor and with their money. Such equitable rights the courts of the land will protect fully and completely.

The situation outlined here differs radically from the situation depicted in Hendricks v. Stewart, 53 N. D. 513, 206 N. W. 790. There the lessee knew, before he sowed his crop, that the time for redemption expired before the crop could mature, and, unless the mortgagor redeemed within that time, title to the land and the crop would pass

to the one entitled to the deed. As against the owner of the land he had no equity. The decision in the case cited governed a situation entirely different from one arising under this statute, where a crop is sown in reliance upon the act.

The power of the legislature is not a grant of powers. The legislature is supreme in the enactment of legislation, unless there is a limitation on its powers found in either of the great fundamental and basic documents—the Constitution of the state and the Constitution of the United States—and before the court can say the legislature has no power to enact such legislation the mandate against its exercise must be clear and plain.

As said in William v. Evans, 139 Minn. 32, 165 N. W. 495, 166 N. W. 504, L.R.A.1918F, 542, the "state legislature possessed all legislative power not withheld or forbidden by the state or Federal Constitution."

But, however great the emergency, or however wide-spread the power of the legislature, if limited by provisions in either of these Constitutions its power can be no greater than its authority, and if this power to act in certain cases is specifically denied by either Constitution or both no power can be exercised.

It is the contention of the appellant that even if this law does violate the state constitutional provision against the impairment of contract, yet a valid exercise of the police power of the state may require this constitutional provision to yield to the right of the state to preserve its own existence, and to maintain and protect that for which the state is created.

While the limit of police power cannot be defined accurately, being always concerned with the facts which invoke its exercise, yet it is subject to constitutional limitations. Judge Brandeis in delivering the opinion of the United States Supreme Court in Hamilton v. Kentucky Distillers & Warehouse Co. 251 U. S. 146, 64 L. ed. 194, 40 S. Ct. 106 says: "The war power of the United States, like its other powers, and *like the police power of the states* is subject to applicable constitutional limitations."

The public policy of the state must yield to the Constitution of the United States and therefore the exercise of the police power, of this

or any other of the forty-eight states can not be as extensive as that of an independent sovereign power.

Section 134 of the Constitution says: "The exercise of the right of eminent domain shall never be abridged, or so construed as to prevent the legislative assembly from taking the property and franchise of incorporated companies and subjecting them to public use, the same as the property of individuals; and the exercise of the police power of this state shall never be abridged; or so construed as to permit corporations to conduct their business in such a manner as to infringe the equal rights of individuals or the general well-being of the state."

In Bismarck v. Hughes, 53 N. D. 838, 844, 208 N. W. 711, 713, this court said: "The police power is an attribute of sovereignty itself, under which, life, liberty, and property, are made safe. It is necessary for the preservation of the state and the welfare of society. It is a legislative function without limitation, except that it must not conflict with the state or Federal Constitution, and unless the statute is clearly repugnant to some constitutional guaranty, the courts cannot interfere."

Clearly therefore the exercise of the police power is governed by the constitutional provisions, and its exercise must be performed in accordance with the Constitution, the same as any other governmental function.

It is true there are numerous decisions of courts of last resort to the effect that the constitutional provisions regarding obligations of contract must yield to the exercise of the police power, but a large number of these are cases wherein the state was attempting to vary or impair the terms of a contract into which the state itself had entered. Such contracts are entered into with full knowledge that they are subject to the exercise of the police power of the state—one of the parties to the contract—and if any provision in the contract would appear to waive the exercise of the police power such provision may be considered void as against public policy.

In Northwestern Fertilizing Co. v. Hyde Park, 97 U. S. 659, 24 L. ed. 1036; Stone v. Mississippi, 101 U. S. 814, 25 L. ed. 1079; Butchers' Union S. H. & L. S. L. Co. v. Crescent City L. S. L. & S. B. Co. 111 U. S. 746, 751, 28 L. ed. 585, 587, 4 S. Ct. 652; New Orleans Waterworks Co. v. Rivers, 115 U. S. 674, 29 L. ed. 525, 6 S. Ct. 273; Holden v. Hardy, 169 U. S. 368, 42 L. ed. 780, 18 S. Ct. 383; Walla Walla

v. Walla Walla Water Co. 172 U. S. 1, 43 L. ed. 341, 19 S. Ct. 77; Chicago, B. & Q. R. Co. v. Illinois, 200 U. S. 561, 50 L. ed. 596, 26 S. Ct. 341, 4 Ann. Cas. 1175; Bacon v. Walker, 204 U. S. 311, 51 L. ed. 499, 27 S. Ct. 289, and numerous other cases the Supreme Court of the United States has given "a full exposition of the extent of the right of the state under this power to impair or annul contracts that it has entered into."

The public policy of the state must yield to the Constitution of the United States. Even though argued that all contracts made with a state are presumed to be subject to the police power of the state, "with the knowledge that such power is inalienable and continuing authority," yet even such a contract made with the state itself, or any of its municipalities, must be determined in the light of this constitutional provision and cannot be impaired. The police power may be used to regulate but not to destroy its own contracts. In Grand Trunk Western R. Co. v. South Bend, 174 Ind. 203, 89 N. E. 885, 91 N. E. 809, 36 L.R.A. (N.S.) 850 the supreme court of Indiana upheld the right of the state, in the exercise of its police power to enjoin the railway company from laying a second track through the city under a power granted by its franchise on the ground that the police power of the city in the preservation of the health and safety of its citizens was superior to the contract and that the contract was executed with the full knowledge of the police power in the right thereof saying: "The constitutional prohibition of the impairment of contracts does not extend to subjects affecting the health, safety and general welfare of the public." The city had adopted an ordinance to this effect, under the exercise of the authority granted by the state. But the Supreme Court of the United States in 227 U. S. 544, 56 L. ed. 633, 33 S. Ct. 303, 44 L.R.A. (N.S.) 405, says: "The facts show that the contract was actually impaired by the ordinance—in violation of the provision of § 10 of article 1 of the Constitution of the United States." The court said such attempts as involved in this case "are rendered impossible by the provisions of the Constitution of the United States prohibiting its impairment of a contract by legislation of a state, whether acting through a general assembly or a municipality exercising delegated legislative powers." No claim was made that the Constitution of Indiana forbade the im-

pairment of contracts or as in the case of our constitution the legislature was forbidden to pass any law affecting the same.

Many cases involve acts of Congress, but constitutional prohibition against impairment of contracts does not apply to the Federal government. Burke v. Bryant, 283 Pa. 114, 128 Atl. 821.

Another distinction must also be noted. Contracts are not impaired because the state or the Federal government may, after the execution of the contract, make the doing of certain acts a crime and the place a nuisance. Hence what may have been lawful at one time becomes unlawful at another and a contract for lease of the place may be impaired or cancelled. It is true that by the enactment of a law making certain acts a crime there may be, as an incident thereof, a result which renders a contract valueless; but this comes as an incident to the exercise of a power wherein the state is supreme. A frequent illustration is in the prohibitory law of the United States known as the Volstead Act (U. S. C. title 27, §§ 1 et seq.) which permitted the cancellation of a lease of premises where the violation of the law was being carried on. A lessor convicted of a violation of law might find his contract impaired and annulled without his consent; but this condition came about because of his violation of law.

It is a general rule of construction that the act of the legislature or particular branch of the government entrusted with the enactment of laws is presumed to be in harmony with the Constitution of this state, and of the United States. It is not presumed, that even through mistaken judgment, the legislature attempts to enact legislation which is forbidden. Not only this but the conflict with the Constitution of this state or the Constitution of the United States must be so clear and plain that no reasonable doubt can exist but what the conflict is there. The people of this state have themselves recognized the wisdom of such a rule in providing that "In no case shall any legislative enactment of law in the state of North Dakota be declared unconstitutional" unless four of the five judges comprising the supreme court of this state shall so decide. See § 89 of the state Constitution as amended in 1918.

But not only have the people of this state made a solemn constitutional declaration that the legislature can not deprive a person of his property without due process of law nor impair the obligations of

534

contracts, but the United States Constitution has specific provision bearing on this subject.

The Constitution of the United States says, in § 10 of article 1:

"No state shall enter into any treaty, alliance or confederation; grant letters of marque and reprisal; coin money; emit bills of credit, make anything but gold and silver coin a tender in payment of debts; *pass any bill* of attainder, ex post facto law, or *law impairing the obligation of contracts* or grant any title of nobility."

We set out this Federal constitutional provision to show that the "impairment of obligations of contracts" is but one of the many restrictions placed upon such legislative body by the Federal Constitution.

The 14th Amendment to the Constitution of the United States expressly states in § 1 thereof: . . . "No state shall make or enforce any law which shall abridge the privilege or immunities of citizens of the United States, *nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."*

Reliance is had on the decisions in Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 65 L. ed. 877, 41 S. Ct. 465, supra; Edgar A. Levy Leasing Co. v. Siegel, 258 U. S. 241, 66 L. ed. 595, 42 S. Ct. 289, supra; and Block v. Hirsh, 256 U. S. 135, 65 L. ed. 865, 41 S. Ct. 458, 16 A.L.R. 165, supra.

In his brief defendant says he "concedes that if Senate Bill No. 2 can not be sustained upon the principles of these decisions then its constitutionality can not be sustained at all, because the Courts in these decisions have gone to the limit or 'verge of the law' to sustain the police power of the state of New York and of Congress."

The first and second cases involved the New York statute wherein the legislature applied the general principles that a business which was affected by public interest was being regulated—the doctrine applied to public utilities, carriers, etc.—and that reasonable rents could be determined by the same principles that reasonable rates are determined. The landlords were engaged in the business of renting premises and so long as they were afforded reasonable rent the courts held that for an emergency measure the business of renting could be regulated. The contracts of leases involved were those made after the law went into effect—the tenant could hold over, was required to pay

a reasonable rent and machinery was provided for ascertaining this in case no agreement was made privately.

The third case dealt with an act of congress and there is no constitutional provision preventing the United States from impairing the obligations of contract but there is a provision against depriving a person of property "without due process of law." Amendment 5. The Supreme Court of the United States held that this act of congress did not deprive a person of property without due process of law. If the owner wanted his property for his own personal use he could dispossess his tenant; if he wanted to rent it he could rent it but owing to the war conditions the renting of property became a business coupled with a public interest and his rights could be regulated during the emergency. If the tenant in possession desired to remain therein and paid a reasonable rent he could remain; but the landlord's rights were protected. These three decisions provoked a sharp difference of opinion, even with all the safeguards thrown around the rights of the owner. Even then the cases were decided by a five to four vote.

In the case at bar we are confronted with a condition where the state is prohibited by its own constitution and the United States Constitution from impairing the obligations of contract; where the state by its own constitution is prevented from depriving a person of his property without due process of law; and where there is no attempt made whatever to give any redress or compensation of any nature or description in lieu of the rights taken.

It is argued that the condition in which the state finds itself is ample reason for disregarding temporarily the constitutional provisions which by its very terms the law intended merely as a temporary measure and therefore these provisions of the Constitution must be suspended during the period of this emergency. Though, in the troublous times in which we are placed the legislators and the people of the state seek by decisive measures to accomplish needs that are deemed just and proper, nevertheless we are required to enforce a specific provision of the Constitution of the United States as well as a provision of the Constitution of this state. The people adopted the constitution framed by skilled men and knew that in great emergencies rulers of the past, including legislators, actuated by the highest motives, had sought by "decisive measures to accomplish ends deemed just and proper; and

that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious, consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false." Ex parte Milligan, 4 Wall. 2, 120, 18 L. ed. 281, 295.

So long as the people of this state and the people of the United States say in their fundamental laws that this state shall not under any circumstances or at any time pass any law impairing the obligations of a contract just so long must the courts follow the expressed will of the people.

The advice and warning of George Washington in his farewell address are as applicable today as they were in 1796 when he said: "The basis of our political systems is the right of the people to make and to alter their constitutions of government. But the constitution which at any time exists till changed by an explicit and authentic act of the whole people is sacredly obligatory upon all. The very idea of the power and right of the people to establish government presupposes the duty of every individual to obey the established government."

The judges of this state, as well as the members of the legislature and the executive officers, have taken an oath to support the Constitution of this State and the Constitution of the United States, and in interpreting a legislative enactment, its validity and scope, we must do so in the light of these documents.

It must not be forgotten that the right of private contracts is no small part of the liberty of the citizen, and that the usual and most important function of courts of justice is to maintain and enforce contracts, unless it clearly appears they contravene public policy or express law.

But a legislative enactment may consist of different provisions, some of which are not vulnerable to attack on the ground of unconstitutionality, and in the act under consideration we have the expressed declara-

tion of the legislature itself set forth in § 4 of the Act recognizing such possibility. Whether this statement in § 4 amounts to an intimation on the part of the legislature that it may have had some doubt as to the constitutionality of the Act itself or the portions thereof is not necessary to determine, even if we could do so.

But because this law may not be applicable to all conditions does not say it is so unconstitutional as to deprive it of any validity whatever. The legislature in the exercise of its judgment has the right to extend the period of redemption from one year to any period it sees fit, and therefore it must be clear that all mortgages executed after the passage of this law will be governed by the provisions of this law, and other laws in force not in conflict therewith. Section 5 known as the emergency clause makes specific provision for the application of existing laws in apparent conflict with this law, after the time limit of this law has expired. The legislature is presumed to intend a constitutional law and if such law enacted is capable of application and construction which sustains its validity even to a limited degree, it is the duty of the court to so declare. Because the law may not be as far-reaching as an interpretation of its terms may indicate an interest does not militate against its constitutionality in respect to those matters which it is shown to govern.

It is the judgment of this court that the provisions of this law do not apply to the mortgage foreclosure in question and therefore the writ as issued is valid.

The judgment is affirmed.

NUESSLE, Ch. J., and BURKE, BIRDZELL and CHRISTIANSON, JJ., concur.