MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Appellant, v. SHENKBERG-MOORE REALTY COMPANY et al., Appellees.

No. 44339.

OCTOBER 25, 1938.

Gerald F. Harrington, for appellant.

Franklin E. Gill, for appellees.

1150

SAGER, C. J.— This case brings up the disputed question whether or not an application under the moratorium act shall or shall not be granted. The frequency with which this has arisen and the different facts presented in the various cases attest that no rule may be adopted which will fit all cases. Each must be determined on its own peculiar facts, and the cited cases can serve only as guides to a right conclusion.

 This quotation from First Trust Joint Stock Land Bank v. Abkes, 224 Iowa 877, 278 N. W. 183, will give a general idea of our views upon the subject [page 882 of 224 Iowa, page 185 of 278 N. W.]:

"There is no warrant for any court to deny said extended period of redemption, unless there is an affirmative showing of good cause why said period should not be extended, and such good cause cannot be limited to a showing of present insolvency and present inadequacy of the security."

The principle here announced has been frequently asserted in like causes. Baurer et al. v. Myers et al., 224 Iowa 854, 278 N. W. 302; First Trust Joint Stock Land Bank of Chicago v. Albers et al., 224 Iowa 865, 277 N. W. 451; Replogle et al. v. Ebert et al., 223 Iowa 1007, 274 N. W. 37; First Trust Joint Stock Land Bank of Chicago v. Jelsma et al., 221 Iowa 1191, 268 N. W. 76. The list is not complete but is sufficient for our purpose.

The case before us differs from those cited in this: the appellant corporation is arrayed in this contest against the receiver of the appellee corporation. This receiver in turn is in effect acting to protect the stockholders of the corporation which is likewise in receivership. We can best state the situation in the receiver's own language:

"I am Receiver of the Shenkberg-Moore Realty Company and am now Secretary of the Company. On March 26,.1934, I was appointed joint receiver, with Mr. Gleysteen of the O. J. Moore Grocer Company and Shenkberg-Moore Realty Company, and on November 2, 1934, I was appointed sole receiver of the Shenkberg-Moore Realty Company for the purpose of continuing the business and not liquidating it. The Realty Company owns this property involved in this action. Formerly the O. J. Moore Grocer Company owned all of the stock of the Shenk-

berg-Moore Realty Company. Then in November, 1934, the receiverships were separated. I was appointed sole receiver of the Shenkberg-Moore Realty Company. An arrangement was made by the creditors of the Grocer Company for the stockholders of the Grocer Company to have the benefit of this real estate if any. I am holding the $250,000.00 of the Shenkberg-Moore Realty Company stock in trust for all record stockholders of the O. J. Moore Grocer Company.''

■ While the moratory statutes make no distinction between individual and corporate debtors, we are inclined to the view that we may take judicial notice of the fact that in an agricultural state like ours these acts were passed primarily for the purpose of preserving the farm and other homes of distressed debtors.

In Des Moines Joint Stock Land Bank. v. Nordholm et al., 217 Iowa 1319, 253 N. W. 701, in which we upheld the constitutionality of the law, we said (quoting from the opinion of the United States Supreme Court in Home Building & Loan Association v. Blaisdell, a Minnesota case, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481) :

''As the Supreme Court of Minnesota said ([189 Minn. 422], 249 N. W. 334, 337, [86 A. L. R. 1507]), the economic emergency which threatened 'the loss of homes and lands which furnish those in possession the necessary shelter and means of subsistence' was a 'potent cause' for the enactment of the statute.'' [Page 1329 of 217 Iowa, page 706 of 253 N. W.]

The North Dakota court, while dealing with a statute more specifically referring to the agricultural aspect of the question, expressed the same idea in State ex rel. Cleveringa v. Klein, 63 N. D. 514, 249 N. W. 118, 86 A. L. R. 1523.

In Federal Land Bank v. Wilmarth et al., 218 Iowa 339, speaking through Mitchell, J., (dissenting), we said [page 358 of 218 Iowa, page 516 of 252 N. W.] :

''It is of vital public concern to the people of Iowa that the men and women in all parts of the state who, through their own efforts, have secured for themselves and their families a farm or home, be not ousted from their farms or their homes, but that they be given an opportunity with the aid of their government to refinance their farm mortgages.''

And in Replogle et al. v. Ebert et al., supra, 223 Iowa 1007, 274 N. W. 37, we quoted this from the Wilmarth case:

"The purpose of the statute is to afford the owner of the land an opportunity to refinance or pay up the indebtedness and save his farm within the moratorium period."

■ While these expressions were not intended to and do not decide that the moratorium laws are not applicable to corporations as well as to individuals, they do bespeak the thought that arises to the mind when our moratory acts are under consideration. The real status of appellant and appellees with relation to this property has already been pointed out. We think that many of the reasons which might invoke a liberal construction of the law in favor of the debtor are not applicable here. Unless there are strong reasons to impel, we are not disposed to favor the stockholders of this defunct or moribund corporation while its receiver is, in effect, holding the property for the benefit of another corporation likewise in receivership, as against the policyholders of appellant insurance company.

The property involved is described as lots 4, 5, 6, 7, and 8, block 21, Sioux City East Addition, Sioux City, Iowa. On lot 4 is the one-story brick building known as the Crystal Ice Company, which building was formerly used as the heating plant for the two larger buildings. On lots 5 and 6 is an eight-story brick building known as the Wholesale Grocer house. On lots 7 and 8 is a six-story brick garage building known as the Ramp Garage. This property is located on the edge of the retail business district of Sioux City.

The court directed the receiver to pay to the clerk about two-thirds of the rental income (which is about $1200 a month), to be used, first, to pay current or future taxes; second, insurance premium; third, repairs; fourth, any balance to the appellant. No direction appears with reference to the other third. Based on the figures fixed by appellees' experts, there would seem to be a wide margin of security, though it is not in evidence in the history of appellant's claim. One witness for appellees fixed the value at $358,000. He knew nothing of the income of the buildings, but said $500 to $2,000 would be about right on a normal market, although $2,000 appeared to him a ridiculous figure as of today. His view was that the present market is not normal, but "looking up some." Another witness, the deputy

assessor, fixed the assessed valuation in 1933 at $302,600, but this was reduced in 1935 to $289,600, which is its present assessed valuation. He did not know and had not known the income of the property. A third witness fixed the income value of the property at $320 to $2,000, taking into account its rental value or income. This expression of his may afford some light on his opinion: "If we have a good crop this year, real estate values should increase." Notwithstanding this estimate, this last witness would not recommend a loan of $150,000 on the property. One of appellant's witnesses said the salable market value on a normal market was $190,000, but "it would not sell for that today." Another fixed its present value at $150,000. It was his view that if the rental market were normal, the income would be $28,000 per year, and the value $211,000. When asked what, in his opinion, caused the depreciation of the warehouse property, he said:

"Principally because of the obsolescence feature; wholesale houses no longer have the value for storage purposes they had years ago; the wholesale market has changed to a trucking proposition; smaller buildings can be used better than buildings of this type."

Some of these figures would seem to justify the expectation that the appellees might save the property, and to sustain the court's ruling; but the large and continuing increase in the debt compels a different conclusion. The appellee realty company made this loan May 1, 1920. On June 2, 1930, it was renewed at $170,000. April 1, 1934, when the company went into receivership, the debt was $155,000, with no interest due, but the last half of the 1932 taxes, payable on or about September 30, 1933, were in default. On November 1, 1934, when the appellee Munger was made the sole receiver, the debt still stood at $155,000, with $5,000 principal and $4,456 interest defaulted July 1 of that year. The total debt then was $162,464.58. No interest has been paid since January 1, 1934. On the 30th day of April 1937, while the case was being tried, the debt stood at $220,911.42. This will be seen to mark an increase in the debt from April 1, 1934, when the receivership had its inception, to April 30, 1937, in round numbers, allowing for the taxes of 1932 advanced and included in this sum, of more than $50,000. During the twenty-six months from November 1, 1934, to December 31,

1154

1936, the receivership attorneys' and receiver's fees, cost $8,705. During nearly, but not entirely, the whole receivership period, the taxes equalled or exceeded the gross income from the property, with the result that appellant was required to advance between $4,000 and $5,000 for taxes. Meanwhile the debt continues to grow at a great rate, with no immediate prospect of the income becoming large enough to make any substantial reduction therein.

In this state of the record we find that the trial court, in granting the extension under the moratorium statute, should have further ordered and decreed that the acting receiver file his final accounting and be discharged, and that the appellant be appointed receiver in his stead for and during the extension period.

The cause, therefore, is affirmed so far as the decree granted the extension under the moratorium statute, and is reversed with the direction that the court enter its decree requiring the present receiver to render his account, and upon such accounting that said receiver be discharged and the appellant appointed in his place, with all the rights, powers, and duties incident to such receivership.—Affirmed in part; reversed in part, with directions.

KINTZINGER, DONEGAN, HAMILTON, MILLER, STIGER, and RICHARDS, JJ., concur.