# NOVEMBER, 1934

THE TRAVELERS INSURANCE COMPANY ET AL. V. SCHUYLER B. MARSHALL, SR., ET AL.

No. 6791.   Decided November 21, 1934.
(76 S. W., 2d Series, 1007.)

46

*Renfro & McCombs,* and *Jas. A. Kilgore,* of Dallas, for appellant.

Senate Bill No. 3, 2d c. s., 43rd Leg. p. 42, known as the Moratorium Law, violates Art. 1, sec. 16 of the Constitution of the State of Texas, because it is an impairment of the obligation of contracts. Jones v. McMahan, 30 Texas 719; Life Ins. Co. of Va. v. Sanders, 62 S. W. (2d) 348; Murphy v. Phillips (Civ. App.), 63 S. W. (2d) 404; Lingo Lbr. Co. v. Hayes, 64 S. W. (2d) 835.

The police power is subject to constitutional limitations including the limitation upon the power of the State to impair the obligation of a contract. Unless the parties to the contract may be presumed to have contemplated legislative interference, the State cannot regulate the contract without overriding the constitutional limitation. Fort Smith Spelter Co. v. Clear Creek Oil & Gas Co., 267 U. S. 231, 69 L. Ed. 588, 45 Sup. Ct. 263; Houston & T. C. Ry. Co. v. City of Dallas, 98 Texas, 396, 84 S. W. 648; Spann v. City of Dallas, 111 Texas 350, 235 S. W. 513.

The Moratorium Law renders the enforcement of contracts uncertain, and hence is not designed to promote the general welfare of the people, which it must do to be sustained under the police power. Jones v. McMahan, 30 Texas, 719; Jones v. Williams, 121 Texas, 94, 45 S. W. (2d) 130.

*John Davis*, of Dallas, for appellees.

The Texas mortgage Moratorium Law is *not* an impairment of the obligations of the loan contract. Home Building & Loan Assn. v. Blaisdell, 290 U. S., 398, 78 L. Ed. 413; W. B. Wortham Co. v. Thomas, 292 U. S., 426, 78 L. Ed., 975.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

This case, one of eight submitted as companion cases, is before us on certificate from the Court of Civil Appeals for the Fifth (Dallas) District, and involves but one question,—viz., whether or not Chapter 16 of the General Laws of the 43rd Legislature (2d Called Session), 1934 generally known as the "Moratorium Law", violates the Constitution of Texas.

On December 2, 1926, Schulyer B. Marshall, Sr. and wife Janie W. Marshall, obtained a loan from and executed their note to the Republic Trust & Savings Bank, in the sum of $125,000, secured by a deed of trust on 1647 acres of land situated in Dallas County, said to be worth under normal conditions some six or seven hundred dollars per acre,—that is, from eight hundred thousand to one million dollars,—but at the time of the hearing in this cause its value was only about two hundred dollars per acre, or something over three hundred thousand dollars.

The Travelers' Insurance Co., the appellant, became the owner of the note, and upon default in the payment of amounts due, declared the whole due, and caused the trustee to post notices for the sale of the land under the terms of the trust deed.

Before the date of sale, July 3, 1934, Marshall and wife instituted this suit in a District Court of Dallas County, under

the Moratorium Law, and prayed for a writ of injunction, restraining the trustee and the Travelers' Insurance Company from selling the land prior to February 1, 1935, which upon trial was granted. The only defense urged by appellants was that the law is unconstitutional, under Sec. 16, Art. 1, of our State Constitution, prohibiting the enactment of laws impairing the obligation of contracts.

The case was appealed to the Court of Civil Appeals at Dallas, and was there affirmed. On motion for rehearing the Court of Civil Appeals certified the one question involved to this Court.

The Moratorium Law before us is the sixth measure of its type enacted by the Legislature,—the others having previously expired,—and became effective on the first day of March, 1934. Chapters 17, 59, 102, 105, General Laws Regular Session, and Chapters 2 and 16 of Second Called Session, 43d Legislature.

The Act is too lengthy for us to copy in full, but we will make such reference to it is may be necessary.

The purpose of the Act was to attempt to ameliorate the conditions incident to the prevailing economic depression, fully described in the preamble to the Act.

The first section of the Act authorizes judges of the District Courts of the State, in so far as here involved:

"to grant continuances and stays of execution in all suits instituted for the purpose of foreclosing liens upon real property and to grant writs of injunction restraining the sale of real property under powers created by Deeds of Trust or other contracts and to restrain sales under executions and orders of sale issued out of any Court in this State, when it shall be made to appear by verified motion or petition or from evidence adduced upon a trial on the merits or on ex parte or preliminary hearing as follows:

"(a) That the defendant or the relator is justly obligated to pay a substantial portion of the indebtedness but is financially unable to pay the same or any part thereof.

"(b) That a sale of the incumbered property under Deed of Trust or under process of the Court or a sale of the property seized under execution would result in an unfair, unjust and inequitable financial loss to the defendant or relator; and would not be unfair, unjust and inequitable to the creditor taking into consideration the financial condition of all parties.

"(c) That the value of the property involved is substantially in excess of the amount of the debt demanded.

"(d) That the property will probably sell for substantially

less than its value if a sale under Deed of Trust, order of sale, or execution is held in due course.

"(e) That the defendant or relator will not permit the property to be abused, ill-treated or mismanaged and that such property will be managed, controlled and cared for properly during the pendency of the suit.

"(f) That there is a reasonable expectation that the indebtedness will be materially reduced or that a substantial amount thereof will be refinanced within a reasonable time.

"(g) That the defendant or relator will, upon the order of the court, pay into court for application by the clerk upon the indebtedness a sum of money equal to the reasonable value of the income on said property, or if the property had no income, then the reasonable rental value of the property involved in such suit or sale, or a reasonable part of such income or rental value, as determined by the court."

Section 5 makes provisions for successive injunctive or stay orders, or continuances in like manner as in the first instance, but none to be operative beyond February 1, 1935, a date some three weeks after the convening of the next session of the Legislature.

Section 8 undertakes to extend the benefits of the moratory act to those secondarily liable on the debtor's obligation, without regard to the ability of the endorser, guarantor, or surety to pay the obligation of his defaulting principal, etc.

The Act contains other provisions not deemed essential to the present inquiry.

The basic purpose of the Act is to grant stays of action and other proceedings otherwise maintainable on pre-existing contract for the benefit of distressed debtors.

It is obvious from the record that the appellant has been deprived of the rights and remedies for which it contracted under the then existing law from July 3, 1934, to February 1, 1935. Its right to accelerate the maturity of the contract, foreclose its lien, and receive payment of its debt under judicial or trustee's sale, or at such sale bid in and become the owner of the property involved, and under certain conditions obtain a deficiency judgment, has been suspended for seven months, a stay which, of course, could be prolonged under successive legislative Acts so long as the depression continues, should we hold the present law valid.

The question before us, simply stated, is whether or not the Act here involved violates Section 16, Article 1, of the State Constitution,—a part of the Bill of Rights, which declares:

"No bill of attainder, ex post facto law, retroactive law, *or any law impairing the obligation of contracts, shall be made.*" (Italics ours.)

■ Neither the Legislature, Executive Officers, nor the Judiciary can lawfully act beyond the limitations of the Constitution. 9 Texas Jurisprudence, p. 413, sec. 2; Ferguson v. Wilcox, 119 Texas, 280, 28 S. W. (2d) 526; Burgess v. American Rio Grande L. & I. Co., 295 S. W., 649; Stockton v. Montgomery, Dallam, p. 473; Lytle v. Halff, 75 Texas, 128, 12 S. W., 610.

■ Article 1 of the Constitution, comprising 29 sections, is designated THE BILL OF RIGHTS, and consists of *express limitations of power.* The last section declares:

"Sec. 29. To guard against transgressions of the high powers herein delegated, we declare that everything in this 'Bill of Rights' is *excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, * * * shall be void.*" (Italics ours.)

As to the restraints and prohibitions contained in the Bill of Rights, (or in the Constitution generally, for that matter), the rule is that,

"The restraints of the constitution upon the several departments, among which the various powers of government are distributed, cannot be lessened or diminished by inference and implication; and usurpations of power, or the exercise of power in disregard of the express provision or plain intent of the instrument, as necessarily implied from all its terms, cannot be sustained under the pretense of a liberal or enlightened interpretation, or in deference to the judgment of the legislature, or some supposed necessity, the result of a changed condition of affairs." 9 Texas Jur., 449, sec. 35.

■ We are asked, however, to hold that under the *police power,* one of the powers of government, (State v. Coleman, 96 Conn., 190, 130 Atl., 385), vitalized by emergency conditions, the Legislature had the authority to pass the measure before us. We are asked to do this, although the Bill of Rights, Section 16, expressly prohibits the enactment of laws impairing the obligation of contracts. Can we do this? Would we be warranted in saying that because of emergency conditions the Legislature could, in violation of Section 27 of the Bill of Rights, enact legislation prohibiting the citizens of the State from assembling in a peaceful manner for their common good, and applying to those invested with the power of government for redress of grievances? In effect, we have answered that question in the

negative in the case of Bell v. Hill, 123 Texas, 531, 74 S. W. (2d) 113. Could we say that, although Section 26 of the Bill of Rights declares that monopolies shall never be allowed, yet, because of emergency conditions, the Legislature could pass laws for the purpose of allowing monopolies? Could we say that, although Section 15 of the Bill of Rights declares that "The right of trial by jury shall remain inviolate", yet, because of emergency crime conditions, the Legislature, to preserve order and protect life and property, etc., would have the authority under the police power to suspend the right of trial by jury? Could we say that, because of emergency conditions, (an enormous increase in crime, for example, such as the nation now suffers from), that the Legislature would have the power to provide for "excessive bail," "excessive fines," and "cruel or unusual punishments," which are prohibited by Section 13 of the Bill of Rights? Or, could we say that, although Section 13 further provides, "All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law," the Legislature, because of emergency conditions, due to an industrial depression, could enact legislation closing the courts and denying due process? Could we say that, although Section 8 of the Bill of Rights provides, "No law shall ever be passed curtailing the liberty of speech or of the press," still, because of some emergency condition, some prevailing agitation due to an industrial depression, the Legislature would have the power to curtail the liberty of speech and of the press? Could we say that, due to emergency conditions, such as we now have, when creditors can not collect, or have unusual difficulties in collecting, their debts, that the Legislature, in so far as the Constitution of Texas is concerned, has the power, in the aid of *creditors,* to provide for *imprisonment for debt;* although that is prohibited by Section 18 of the Bill of Rights?

Obviously all these questions must be answered in the negative. This is so because the pronouncements of the Constitution are "imperious, supreme and paramount." As said by a leading authority:

"Necessity that is higher than the Constitution can safely have not place in American jurisprudence. That principle is necessarily vicious in its tendency, and subversive of the Constitution. It should be, and is, limited by the constitutional inhibitions. * * * The Constitution, and a controlling necessity antagonistic to its requirements, cannot exist." 9 Texas Jur., p. 421, sec. 10. Stockton v. Montgomery, Dallam (Texas), 473; Ex parte Youngblood, 94 Texas Crim. Rep., 330, 340, 251 S. W.,

509; Snyder v. Baird Ind. School Dist., 102 Texas, 4, 111 S. W., 723, 113 S. W., 521; State v. Hatcher, 115 Texas, 332; Cline v. State, 36 Texas Crim. Rep., 320, 345, 37 S. W., 722.

■ On the concession, for the purposes of this decision, that the majority opinion in the Blaisdell Case (Home Building & L. Assn. v. Blaisdell, 290 U. S., 398, 54 Sup. Ct., 231, 78 L. Ed., 413, 88 A. L. R., 1481) at the time it was delivered correctly interpreted the contract clause of the Federal Constitution in relation to the exercise of the police power by the State, it can have no application to the Constitution of Texas. *The Federal Constitution, it is said, contains no express limitations on the police power of the States as such.* 12 Corpus Juris, p. 928, sec. 440. The majority opinion in the Blaisdell Case (290 U. S., 398) seems to be based upon the proposition that, although the contract clause in the Federal Constitution prohibits the impairment of contracts by State legislation, still a wide range of police control may be exercised by the States, varying with differing conditions, even to the extent of impairing previously existing contracts. (290 U. S., pp. 434, 435, 439.) It is quite obvious the same rule of interpretation can not be applied to the contract clause in our State Constitution for the reason that, unlike the Federal Constitution, the rights guaranteed by that clause (Sec. 16, Art. 1) are by Section 29 of the Bill of Rights *"expected out of the general powers of government, and all laws contrary thereto shall be void."* This is an express limitation on the police power which does not appear in the Federal Constitution; a limitation which plainly prohibits the enactment of legislation the effect of which is to impair the obligation of contracts. Spann v. City of Dallas, 111 Texas, 350, 235 S. W., 513; Bell v. Hill, 123 Texas, 531, 74 S. W. (2d) 120; Murphy v. Phillips (Civ. App.), 63 S. W. (2d) 404; Life Ins. Co. v. Sanders, 62 S. W. (2d) 348; 12 Corpus Juris, p. 929, sec. 440, and cases in note 20; State ex rel. Cleveringa v. Klein, 63 N. D., 514, 249 N. W., 118 (1933); Milkint v. Mc-Neeley, 113 W. Va., 804, 169 S. E., 790; State v. Wood, 51 S. D., 485, 215 N. W., 487 (1927); Wood v. Hamaguchi, 207 Cal., 79, 277 Pac., 113, 63 A. L. R., 861 (1929); Sate v. Coleman, 96 Conn., 190, 113 Atl., 385 (1921); State v. Bassett, 100 Conn., 430, 123 Atl., 842 (1924); State ex rel. v. Yeates, 74 Fla., 509, 77 So., 262 (1917); People v. Chicago, M. & St. P. R. Co., 306 Ill., 486, 138 N. E., 155, 28 A. L. R., 610; Town of Lake View v. Rose Hill Cemetery, 70 Ill., 191 (1873), State ex rel. v. New Orleans, 113 La., 371, 36 So., 999, 67 L. R. A., 70 (1904); Tighe v. Osborne, 149 Md., 369, 131 Atl., 801; 43 A. L. R., 819 (1925);

State v. Miksicek, 225 Mo., 561, 125 S. W., 507; State v. Ramseyer, 73 N. H., 31; State v. Goodwill, 33 W. Va., 179, 185, 10 S. E., 285, 287, 6 L. R. A., 621, 25 Am. St. Rep., 863.

We recognize, of course, that the police power is broad and comprehensive; but the Constitution forbids its exercise when the result would be the destruction of the rights, guarantees, privileges, and restraints excepted from the powers of government by the Bill of Right.

"However broad the scope of the police power, it is always subject to the rule that the legislature may not exercise any power that is expressly or impliedly forbidden to it by the state constitution." 12 C. J., p. 929, sec. 440. Bell v. Hill, 123 Texas, 531, 74 S. W. (2d) 120; State ex rel Cleveringa v. Klein, 63 N. D., 514, 249 N. W., 118; Wilkint v. McNeeley, 113 W. Va., 804, 169 S. E., 790; and other authorities supra.

■ Since the impairment of the obligation of contracts is prohibited by Section 16, Article 1, of the Bill of Rights, *without any specified exception* in favor of legislative action to the contrary during industrial depressions or emergency periods, we are without power to write such an exception into the organic law. As said by one of the Texas authorities previously cited:

"The enactment of laws impairing the obligation of contracts is forbidden by section 16 of article 1 of the constitution of Texas, * * *. The limitation thus imposed is emphatic, unambiguous and without exception; it applies alike to all contracts and protects all obligations of contracts from destruction or impairment by subsequent legislation." 9 Texas Jur., p. 541, sec. 106.

■ However, we will not rest our opinion here, but out of deference to the importance of the legislation before us, will enter upon an inquiry as to whether or not, in view of the history of the contract clause and the decisions relative to it, the police or general governmental power may be so applied to it *in times of emergency* as to permit the legislation here involved. The meaning which a constitutional provision had when adopted, it has to-day; its intent does not change with time nor with conditions; while it operates upon new subjects and changed conditions, it operates with the same meaning and intent which it had when formulated and adopted. 9 Texas Jur., p. 427, sec 18; 6 Ruling Case Law, p. 46, sec. 39; Cooley's Constitutional Limitations (8th ed.), Vol. 1, p. 123. As Judge Cooley says:

"A constitution is not to be made to mean one thing at

one time, and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable. * * * It is with special reference to the varying moods of public opinion, and with a view to putting the fundamentals of government beyond their control, that these instruments are framed.. * * * *The meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it.*" Cooley's Const. Lim., Vol. 1, pp. 123, 124. (Italics ours.)

The postulate being established that the constitutional language, no "law impairing the obligation of contracts shall ever be made," means to-day what it meant in *1875-1876, when the Constitution was formulated by the Convention and adopted by the people,* the problem before us will be solved when we ascertain the meaning of that language as generally understood when the Constitution was adopted. That the contract clause in the various State constitutions was derived from Section 10, Article 1, of the Constitution of the United States, which declares, *"No State shall * * * pass any * * * law impairing the obligation of contracts,"* there is no doubt.

The rule of law is that when a statute or constitutional provision, having a fixed and definite meaning as declared by the courts, is adopted, the interpretation previously given it is likewise adopted at the same time. 9 Texas Jur., p. 428, sec. 19; 6 Ruling Case Law, p. 54, sec. 49.

In the light of this elementary rule, we will enter upon an inquiry as to the meaning of the language used in the Federal and various State Constitutions, as generally understood and declared prior to and at the time we adopted it and incorporated it in our organic law in 1875-1876.

■ Generally it may be said that in determining the meaning, intent, and purpose of a law or constitutional provision, the history of the times out. of which it grew, and to which it may be rationally supposed to bear some direct relationship, the evils intended to be remedied, and the good to be accomplished, are proper subjects of inquiry. Story on the Constitution (4th ed.), Vol. 1, p. 298, sec. 405; 6 Ruling Case Law, pp. 50, 51, secs. 45, 46, and many authorities in the notes; 9 Texas Jur., p. 437, sec. 26, and cases in the notes; Works of Madison, (Pub. by order of Cong. 1884), Vol. 3, p. 664, Vol. 4, p. 17.

Chief Justice Hughes, in the majority opinion in the Blaisdell Case, (290 U. S., 398, 425), stated that, "The constitution was adopted in a period of grave emergency. Its grants of

power to the Federal Government and its limitations of the power of the States were determined in the light of emergency."

The Chief Justice, describing the emergency conditions, further said:

"But the reasons which led to the adoption of that clause, and of the other prohibitions of Section 10 of Article 1, are not left in doubt and have frequently been described with eloquent emphasis. The widespread distress following the revolutionary period, and the plight of debtors, had called. forth in the States an ignoble array of legislative schemes for the defeat of creditors and the invasion of contractual obligations. Legislative interferences had been so numerous and extreme that the confidence essential to prosperous trade had been undermined and the utter destruction of credit was threatened. 'The sober people of America' were convinced that some 'thorough reform' was needed which would 'inspire a general prudence and industry, and give a regular course to the business of society.' *The Federalist*, No. 44. It was necessary to interpose the restraining power of a central authority in order to secure the foundations even of 'private faith'. The occasion and general purpose of the contract clause are summed up in the terse statement of Chief Justice Marshall in Ogden v. Saunders, 12 Wheat., pp. 213, 354, 355: 'The power of changing the relative situation of debtor and creditor, of interfering with contracts; a power which comes home to every man, touches the interest of all, and controls the conduct of every individual in those things which he supposes to be proper for his own exclusive management, had been used to such an excess by the state legislatures, as to break in upon the ordinary intercourse of society, and destroy all confidence between man and man. This mischief had become so great, so alarming, as not only to impair commercial intercourse, and threaten the existence of credit, but to sap the morals of the people, and destroy the. sanctity of private faith. To guard against the continuance of the evil was an object of deep interest with all the truly wise, as well as the virtuous, of this great community, and was one of the important benefits expected from a reform of the government." 290 U. S., pp. 425, 427, 428.

Mr. Justice Sutherland, in the dissenting opinion, by text and foot notes, states quite fully the facts constituting the emergency out of which the language of the Federal Constitution prohibiting the impairment of contracts by State action arose. We can not do better than to quote in part his summary of conditions, the accuracy of which has never been questioned. Justice Sutherland said:

"Following the Revolution, and prior to the adoption of the Constitution, the American people found themselves in a greatly impoverished condition. Their commerce had been well-nigh annihilated. They were not only without luxuries, but in great degree were destitute of the ordinary comforts and necessities of life. In these circumstances they incurred indebtedness in the purchase of imported goods and otherwise, far beyond their capacity to pay. From this situation there arose a divided sentiment. On the one hand, an exact observance of public and private engagements was insistently urged. A violation of the faith of the nation or the pledges of the private individual, it was insisted, was equally forbidden by the principles of moral justice and of sound policy. Individual distress, it was urged, should be alleviated only by industry and frugality, not by relaxation of law or by a sacrifice of the rights of others. Indiscretion or imprudence was not to be relieved by legislation, but restrained by the conviction that a full compliance with contracts would be exacted. On the other hand, it was insisted that the case of the debtor should be viewed with tenderness; and efforts were constantly directed toward relieving him from an exact compliance with his contract. As a result of the latter view, state laws were passed suspending the collection of debts, remitting or suspending the collection of taxes, providing for the emission of paper money, delaying legal proceedings, etc. * * * Real property could be sold only at a ruinous loss. Debtors, instead of seeking to meet their obligations by painful effort by industry and economy, began to rest their hopes entirely upon legislative interference. The impossibility of payment of public or private debts was widely asserted, and in some instances threats were made of suspending the administration of justice by violence. The circulation of depreciated currency became common. Resentment against lawyers and courts was freely manifested, and in many instances the course of the law was arrested and judges restrained from proceeding in the execution of their duty by popular and tumultous assemblages. This state of things alarmed all thoughtful men, and led them to seek some effective remedy. Marshall, Life of Washington (1807), Vol. 5, pp. 88, 131."

It is thus seen that while the majority and minority opinions in the Blaisdell Case differs as to the proper construction of the Federal Constitution, yet the entire Court are in substantial accord as to the *condition of affairs* which led to the adoption of the contract clause in the National Organic Act. In the marginal notes to the dissenting opinion, Justice Sutherland col-

lates extracts from the sources of information upon which his summary is based; and although we have used these and the authorities cited in the preparation of this opinion, we refrain from quoting therefrom for the reason that they are available in 290 U. S., pp. 455 et seq.

Judge Story in his Commentaries on the Constitution adverts to the condition of affairs existing at the time the Constitution was adopted, in part saying:

"In this state of things the embarrassments of the country in its financial concerns, the general pecuniary distresses among the people from the exhausting operations of the war, the total prostration of commerce, and the languishing unthriftiness of agriculture, gave new impulses to the already marked political divisions in the legislative councils. Efforts were made, on one side, to relieve the pressure of the public calamities by a resort to the issue of paper-money, to tender laws, and instalment and other laws, having for their object the postponement of the payment of private debts, and a diminution of the public taxes. On the other side, public as well as private creditors became alarmed from the increased dangers to property. * * * And they insisted strenuously upon the establishment of a government and system of laws which should preserve the public faith, and redeem the country from that ruin which always follows upon the violation of the principles of justice and the moral obligation of contracts. 'At length,' we are told, 'two great parties were formed in every State, which were distinctly marked, and which pursued distinct objects with systematic arrangement. The one struggled with unabated zeal for the exact observance of public and private engagements. * * * The other party marked out for itself a more indulgent course. They were uniformly in favor of relaxing the administration of justice, or affording facilities for the payment of debts, or of suspending their collection and of remitting taxes." Story on the Constitution (4th ed.), Vol. 1, p. 201, sec. 286.

Henry Campbell Black, in his work on Constitutional Prohibitions (Edition of 1887, pp. 4-6), in part summarized the conditions which led to the adoption of the contract clause, etc., in the Federal Constitution, as follows:

"The long and arduous conflict which resulted in the independence of the United States left the people of the newly emancipated colonies with little save their autonomy and a vast but undeveloped country. So severe had been the drain upon their resources, so exhausting the exigencies of the war and the sacrifices which its prosecution had laid upon them, that they found themselves bankrupt in fortune, oppressed with heavy

obligations, and at a loss for means to retrieve their prosperity or ameliorate their condition. Nor did the ultimate restoration of internal peace appear to work any change for the better. For when the courts of justice resumed their suspended process and addressed themselves to the calling of debtors to account, many an honest man proved unable to discharge his obligation, and the seizure and sale of his property, at a ruinous valuation, left him homeless and destitute, without delivering him from the pressure of his debts. In this state of affairs there arose a great clamor for the enactment of laws tending to the relief of debtors. And many of the States * * * began to put in operation various schemes for the temporary improvement of affairs in behalf of the debtor, and against the creditor. * * * In other communities debts were allowed to be cancelled by the delivery of specific property of the debtor at a fixed valuation, as, for example, tracts of pine-barren land. Elsewhere, instalment laws were passed, which authorized the discharge of contracts by payments extending over intervals of several years. The courts of justice were in many places closed. * * * In the money-markets the utmost confusion and uncertainty prevailed, even in the most important transactions. Few men were willing to stake their property upon ventures which, instead of yielding them profit, might easily result in the wreck of their fortunes, through the practical impossibility of enforcing collections, or the necessity of accepting payment in a depreciating and almost worthless currency. * * *

"The crisis gave rise to two great political parties in each State, diametrically opposed in their theories, but equally zealous in the advocacy of their principles. The one pressed for further indulgence to the debtor class, for still less severity in the enforcement of contracts, for relaxing the administration of justice, for suspending collection, and for anything that would afford temporary relief to those whose misfortunes engaged their care. The other party contended for the great principle that a sacred observance of good faith and the strict enforcement of the laws are alike indispensable to the internal welfare of a people and the respect they seek abroad. * * * It was at this juncture that the Constitutional Convention met."

John Fiske, in his work "The Critical Period of American History," has reviewed at length the emergency conditions prevailing when the Constitutional Convention met in 1787, but space does not permit us to do more than quote brief extracts as indicative of his conclusions. Writing with reference to the sttae of affairs preceding the Convention, he says, in part:

"There is no telling how long the wretched state of things

which followed the Revolution might have continued, had not the crisis been precipitated by the wild attempts of the several states to remedy the distress of the people by legislation. That financial distress was widespread and deep-seated was not to be denied.

\* \* \* \* \*

"After the collapse of this continental currency in 1780, it seemed as if there were no money in the country.

\* \* \* \* \*

"In view of all these complicated impediments to business on the morrow of a long and costly war, it was not strange that the whole country was in some measure pauperized.

\* \* \* \* \*

"By 1786, under the universal depression and want of confidence, all trade had well-nigh stopped. \* \* \* There was a Barmecide feast of economic vagaries; only now it was the several states that sought to apply the remedy, each in its own way. And when we have threaded the maze of this rash legislation, we shall the better understand that clause in our federal constitute which forbids the making of laws impairing the obligation of contracts.

\* \* \* \* \*

"Under such circumstances the payment of debts and taxes was out of the question; and as the same state of things made creditors clamorous and ugly, the courts were crowded with lawsuits. \* \* \* Homesteads were sold for the payment of foreclosed mortgages, cattle were seized in distrainer, and the farmer himself was sent to jail."

After detailing the history of the Act for the government of the Northwest Territory, the meeting of the Constitutional Convention, and the preparation of the Constitution, Fiske declares:

"The following clause provided against a recurrence of some of the worst evils which had been felt under the 'league of friendship.' 'No state shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money; emit bills of credit; make anything but gold and silver coin a tender in payment of debts; pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts; or grant any title of nobility.'" John Fiske's Historical Writ-

ing (Riverside Press Ed.), Vol. 12—The Critical Period of American History—pp. 193 to 217, p. 323.

For the history of the times preceding the Convention of 1787, see, also, Ridpath's History of the United States (Official Edition), Vol. 7, Chap. 52, and Thorpe's Constitutional History of the United States (Ed. 1901), Vol. 1, pp. 243 to 288.

It was in the midst of this confused, gloomy, and seriously exigent condition of affairs described above that the Convention to form our National Constitution met at Philadelphia in May, 1787. The delegates to the Convention were the most distinguished and learned men of the nation. Jefferson, writing from France, said the Convention was an assembly of demigods. (Ridpath's History of the United States (Official Edition), Vol. 7, p. 3260.) Twenty-nine of its fifty-five attending members were said to have been university graduates. John Fiske's "The Critical Period of American History," supra, p. 266. Franklin and Washington, two of the greatest men the race has produced, were delegates. Ridpath briefly reviews the accomplishments of many of its members, and after referring to Jefferson's opinion, himself concludes that an equal assembly could have been obtained with difficulty in Europe.

Speaking of the delegates to the Convention, Thorpe, the historian, says:

"These men were familiar with the multifarious and vexatious questions before the country; they had guided the nation thus far; they knew its wants and were accustomed to the practical administration of public affairs. They were of the people, and understood the principles which underlie national political systems. It was because of their varied experience that they were able to form a Constitution of government, which, it is believed, is adapted in its principles to the wants of the nation for ages to come." Thorpe's Constitutional History, Vol. 1, p. 291. See Chief Justice Marshall's opinion in Cohen v. Virginia, 6 Wheat. (U. S.), 387, 389.

When we recall that under the aegis of the Constitution this nation, in less than 150 years, became one of the great powers of the world, where opportunity has been the greatest for the average man; where there has been more individual freedom, and more reliance on individual initiative and effort than at any other period in the history of the race; where wealth is more evenly distributed; where the people have the greatest opportunity for education and culture; and where all may enjoy not only the necessities of life, but the humblest have many of its luxuries, we are prepared to believe with Gladstone that *"The American Constitution is the most wonderful work ever struck*

*off at a given time by the brain and purpose of man."* John Fiske's History, supra, p. 264.

The first inhibition in American Jurisprudence against laws impairing the obligation of contracts was in the Treaty of Peace with Great Britain and the Colonies; and the second in the Act of Congress in 1787 providing for the government of the Northwest Territory. Elliott's Debates, Vol. 2, p. 961.

The meager record of the proceedings of the Constitutional Convention shows that when the proposal was made to place in the Constitution the clause against the impairment of contracts, contained in the Act for the government of the Northwest Territory, it was objected to by Gouverneur Morris and Colonel Mason, but approved by Madison, as shown by Madison's report of the proceedings as follows:

"Mr. Gouverneur Morris: This would be going too far. There are a thousand laws relating to bringing actions, limitations of actions, etc., which affect contracts. The judicial power of the United States will be a protection in cases within their jurisdiction, and within the State itself a majority must rule, whatever may be the mischief.

\*  \*  \*  \*  \*

"Colonel Mason: This is carrying the restraint too far. Cases will happen that can not be foreseen, where some kind of interference will be proper and essential. He mentioned the case of limiting the period for bringing actions on open accounts—that of bonds after a certain lapse of time—asking whether it was proper to tie the hands of the States from making provisions in such cases.

\*  \*  \*  \*  \*

"Mr. Madison admitted that inconvenience might arise from such a prohibition; but thought on the whole it would be overbalanced by the utility of it. He conceived, however, that a negative on the State laws could alone secure the effect. Evasions might and would be devised by the ingenuity of the legistures." Elliott's Debates, Vol. 5, p. 485; Watson on the Constitution (Ed. 1910), Vol. 1, pp. 775, 776.

The subject went to the Committee on Style, whose report containing the clause as it now stands was adopted. Watson on the Constutition, supra, pp. 775, 777. When the Constitution was submitted for ratification to the several States, the discussions in the course of the campaign for its adoption show that the intent and purpose of the contract provision was thoroughly understood.

Luther Martin, delegate from Maryland, the most distinguished advocate of his time, shortly after the adjournment of the Convention, in making his report to the Legislature on his actions as a delegate, voiced his opposition to the adoption of the Constitution, and urged as one ground therefor that the contract clause withdrew from the States the power to grant relief in time of economic emergency. In part he declared:

"The same section also puts it out of the power of the States to make anything but gold and silver coin a tender in payment of debts or *to pass any law impairing the obligation of contracts.*

*"I considered, sir, that there might be times of such great public calamities and distress, and of such extreme scarcity of specie, as should render it the duty of the government, for the preservation of even the most valuable part of its citizens, in some measure to interfere in their favor, by passing laws totally or partially stopping courts of justice; or authorizing the debtor to pay by installments, or by delivering up his property to his creditors at a reasonable and honest valuation. The times have been such as to render regulations of this kind necessary in most or all of the States, to prevent the wealthy creditor and the moneyed man from totally destroying the poor, though industrious debtor. Such times may again arrive. I, therefore, voted against depriving the States of this power—a power which I am decided they ought to possess,* but which, I admit ought only to be exercised on very important and urgent occasions. I apprehend, sir, the principal cause of complaint among the people at large is, the public and private debt with which they are oppressed, and which, in the present scarcity of cash, threatens them with destruction, unless they can obtain so much indulgence, in point of time, that by *industry and frugality,* they may extricate themselves." Elliott's Debates on the Federal Constitution, Vol. 1, p. 376. (Italics ours.)

On the other hand, James Wilson, the learned Scotchman, educated in both the Civil and Common Law, in the debates before the Pennsylvania Convention, in session to consider the adoption of the Constitution, defended the contract clause, declaring:

*"Permit me to make a single observation, in this place upon the restraints placed on the state governments. If only the following lines were inserted in this Constitution, I think it would be worth their adoption: 'No state shall hereafter emit bills of credit; make anything but gold and silver coin a tender in payment of debts; pass any bills of attainder, ex post facto law, or law impairing the obligation of contracts.' Fatal experience*

*has taught us, dearly taught us, the value of these restraints.*
What is the consequence even at this moment? It is true we
have no tender law in Pennsylvania; but the moment you are
conveyed across the Delaware, you find it haunt your journey,
and follow close upon your heels. The paper passes commonly
at twenty-five and thirty per cent discount. How insecure is
property!" Elliott's Debates, Vol. 2, p. 486. (Italics ours.)

In No. 43 of The Federalist, Madison discussed the contract
clause of the Constitution, saying:

"Bills of attainder, ex post facto laws, *and laws impairing
the obligation of contracts,* are contrary to the first principles
of the social compact, and to every principle of sound legisla-
tion. The two former are expressly prohibited by the declara-
tions prefixed to some of the State constitutions, and all of
them are prohibited by the spirit and scope of these funda-
mental charters. Our own experience has taught us, never-
theless, that additional fences against these dangers ought not
to be omitted. Very properly, therefore, have the Convention
added this constitutional bulwark in favor of personal security
and private rights; and I am much deceived if they have not,
in so doing, as faithfully consulted the genuine sentiments as
the undoubted interests of their constituents. *The sober people
of America are weary of the fluctuating policy which has di-
rected the public councils. They have seen with regret and
with indignation that sudden changes and legislative interfer-
ences in cases affecting personal rights become jobs in the hands
of enterprising and influential speculators, and snares to the
more industrious and less informed part of the community.
They have seen, too, that one legislative interference is but the
first link of a long chain of repetitions; every subsequent inter-
ference being naturally produced by the effects of the preced-
ing. They very rightly infer, therefore, that some thorough
reform is wanting, which will banish speculations on public
measures, inspire a general prudence and industry, and give
a regular course to the business of society.*" (Italics ours.)

Madison, in his introduction to the convention debates, de-
scribing conditions which obtained when the Convention met,
said:

"In the internal administration of the states, a violation of
contracts had become familiar, in form of depreciated paper
made a legal tender, of property substituted for money, of in-
stallment laws, and of the occlusions (closing) of the courts of
justice, although evident that all such interferences affected
the rights of other states, relatively creditors, as well as citizens
creditors within the state." Elliott's Debates, Vol. 5, p. 120.

Speaking with reference to the purpose of the Convention in placing the contract clause in the Constitution, Mr. Watson in his work on the Constitution makes special note of the views of Jefferson and others, stating:

"As reflecting upon the motives which influenced the Convention to insert this provision in the Constitution, it is of interest to know that in 1823, Mr. Jefferson wrote Mr. Justice Johnson of the Supreme Court of the United States: 'The separate legislatures have so often abused the obligation of contracts that the citizens themselves chose to trust it to the general rather than to their own special authorities.'

"After the Convention which framed the Constitution had adjourned, Roger Sherman and Oliver Ellsworth, members of the Convention from Connecticut, wrote to the Governor of their State, that the clause concerning the restraint of the legislatures of the several States, emitting bills of credit, making anything but money a tender in payment of debts, or impairing the obligation of contracts by ex post facto laws, was inserted in the Constitution as a security to commerce.

\*    \*    \*    \*    \*

"Mr. Jefferson said the clause was inserted because the States had so often interfered with the sanctity of contracts, *while Chief Justice Marshall said it was because 'a course of legislation had prevailed in the States,* which weakened the confidence of man in man.'" Watson on the Constitution, Vol. 1, pp. 778, 779. (Italics ours.)

Thorpe, the historian, says:

"In other States the emission of paper money reduced both public and private credit to the lowest ebb. The evidence of Madison, that the abuse of public credit by the emission of paper money and laws impairing the obligations of contract, were among the principal causes which hastened the formation of the Constitution, may be accepted as the judgment of every thoughtful man in the country. The evils of a depreciating currency, visible in a multitude of discriminating stay laws, in the increase of litigation and in the decadence of public morality, seem at this time, the more we study them, almost beyond remedy." Thorpe's Constitutional History of the United States, supra, Vol. 1, pp. 270, 271. See, also Warren's "The Making of the Constitution," pp. 552, 555, quoted by Justice Sutherland, 290 U. S., p. 463.

■ This examination into the history of the times out of which the contract clause arose in connection with the history of its incorporation in the Constitution, and the discussion pro and

con during the course of its ratification by the States, leaves no room for doubt that the contract clause was placed in the Constitution for the very purpose of preventing the enactment of moratory laws.

An examination of the opinions of the Supreme Court of the United States and of those of the State Supreme Courts, including Texas, leads to the same conclusion.

United States Supreme Court Cases: Dartmouth College v. Woodward, 4 Wheat., 518 (1819); Ogden v. Saunders, 12 Wheat., 213, 215 (1827); Bronson v. Kinzie, 1 How., 311 (1843); McCracken v. Hayward, 2 How., 608 (1844); Gantly's Lessee v. Ewing, 3 How., 707 (1845); Howard v. Bugbee, 24 How., 461 (1860); Gunn v. Barry, 15 Wall., 610 (1872); Walker v. Whitehead, 16 Wall., 314 (1872); Edwards v. Kearzey, 96 U. S., 595 (1877); Barnitz v. Beverly, 163 U. S., 118 (1895); Bradley v. Lightcap, 195 U. S., 1 (1903).

The State Supreme Court Cases are listed in the foot notes on succeeding pages of this opinion.[1]

In considering the cases listed it generally will be found that the moratory enactments involved were adopted during or following some period of emergency due to war or its after effects, or to industrial depressions. Aside from the prolonged economic distress following the Revolutionary War, there had been five major panics and economic depressions, prior to the existing one which began in 1929, viz., the panics and depressions of 1819, 1837, 1857, 1873, and 1893. Dewey's Financial History of the United States, pp. 223, 229, 243, 262, 281, 370, 444.

We will now discuss some of the above cited cases.

In the case of Dartmouth College v. Woodward, 4 Wheaton, 518, 628, the opinion states that counsel for Woodward had insisted that the contract clause of the Constitution "must be understood as intended to guard against a power of at least doubtful utility, the abuse of which had been extensively felt; and to restrain the legislature in future from violating the right to property. That anterior to the formation of the constitution, a course of legislation had prevailed in many, if not in all, of the States, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of engagements. To correct this mischief, by restraining the power which produced it, the State legislatures were forbidden 'to pass any law impairing the obligation of contracts.'"

In response to this, Chief Justice Marshall declared:

*"The general correctness of these observations can not be*

*controverted."*

In Ogden v. Saunders, 12 Wheat. (U. S.), 213, 254, 255, Chief Justice Marshall again adverted to the state of affairs preceding the formation of the Constitution, as shown in the extract from Chief Justice Hughes' opinion previously quoted.

The case of Bronson v. Kinzie, 1 How., 311, involved a moratory statute of Illinois, enacted in 1841, apparently in response to conditions growing out of the depression of 1837. The Supreme Court of the United States, in an opinion by Chief Justice Taney, held the Act void because it impaired the obligation of contracts entered into prior to its enactment. The reporter's headnote reads:

"A mortgage contained a power to the creditor to sell on breach of the condition, and thereby pay the debt; this power was valid, under the laws of the State when given. *Held,* that a law, subsequently passed, giving to the mortgagor twelve months to redeem the property from the purchaser at such a sale, and prohibiting it from being made for less than two-thirds of its appraised value, so altered the remedy of the creditor, as to impair the obligation of the contract."

The case of McCracken v. Hayward, 2 How., 608, also involved an Illinois statute. The court held:

"A state law, which prohibits property from being sold on execution for less than two-thirds the valuation made by appraisers, pursuant to the directions contained in the law, impairs the obligation of contracts, and is inoperative upon executions issuing on judgments founded on contract."

In the case of Gantly's Lessee v. Ewing, 3 How., 707, the Supreme Court held void an Indiana statute enacted in 1841, because violative of the contract clause of the Federal Constitution, holding that:

"As to existing mortgages, foreclosable by a sale, the legislature could not prohibit the sale for less than half the appraised value of the land, because such a law impairs the obligation of a contract."

The case of Howard v. Bugbee, 24 How., 461, involved a statute of Alabama enacted in 1841 or 1842, incident to the depressed condition of the time. The validity of the statute had been sustained by the Supreme Court of Alabama because of emergency conditions. Bugbee v. Howard, 32 Ala., 713 (1858). When the case, however, reached the Supreme Court of the United States, that Court, notwithstanding the economic depression graphically described by the Supreme Court of Alabama, held:

"The State of Alabama, authorizing a redemption of mort-

gaged property in two years after the sale under a decree, by bona fide creditors of the mortgagor, is unconstitutional and void as to sales made under mortgages executed prior to the date of its enactment as impairing the obligation of the contract."

■ When the opinion of the Supreme Court of the United States is read in the light of the holding made and reasons given by the Alabama Supreme Court, it is conclusive that the United States Supreme Court *directly* and *purposely* overruled the contention that emergency conditions could give validity, as against the contract clause of the Constitution, to a statute which impaired contracts existing prior to its enactment.

The case of Edwards v. Kearzey, 96 U. S., 595, decided in 1877, involved the validity of a section of the Constitution of North Carolina adopted in 1868, increasing the exemptions to which a debtor should be entitled as against a debt existing prior to the organic act.

■ The State Supreme Court of North Carolina had previously sustained the validity of the provision primarily because of the distressed condition of the people due to the Civil War and its after effects. Garrett v. Cheshire, 69 N. C., 396, 405; Justice Sutherland's opinion in the Blaisdell Case, 290 U. S., 469, 470.

The Supreme Court of the United States held that the Act impaired the obligation of contracts existing prior to its adoption, and that:

"The remedy subsisting in a State when and where a contract is made, and is to be performed, is a part of its obligation; and any subsequent law of the State, which so affects that remedy as substantially to impair and lessen the value of the contract, is forbidden by the Constitution of the United States, and, therefore, void." Edwards v. Kearzey, 96 U. S., 595.

In discussing the question the Court reviewed at length the history of the times which gave rise to the contract clause in the Federal Constitution; showed clearly that it *was intended to apply to emergency conditions existing at the time of the adoption of the Constitution; that its purpose was to cure the evils of debt repudiation and delay then prevalent; and to prevent the enactment of any like laws in the future under the same or similar conditions.* In part the Court said:

"The history of the national Constitution throws a strong light upon this subject. Between the close of the war of the revolution and the adoption of that instrument, unprecedented pecuniary distress existed throughout the country.

" 'The discontents and uneasiness, arising in a great measure

from the embarrassment in which a great number of individuals were involved, continued to become more extensive. At length, two great parties were formed in every State, which were distinctly marked, and which pursued distinct objects with systematic arrangements.' 5 Marshall's Life of Washington, 85. One party sought to maintain the inviolability of contracts, the other to impair or destroy them. 'The emission of paper money, the delay of legal proceedings, and the suspension of the collection of taxes, were the fruits of the rule of the latter, wherever they were completely dominant.' Id. 86.

" 'The system called justice was, in some of the States, iniquity reduced to elementary principles.' * * * 'In some of the States, creditors were treated as outlaws. Bankrupts were armed with legal authority to be persecutors, and, by the shock of all confidence, society was shaken to its foundations.' Fisher Ames's Works (Ed. of 1809), 120.

\* \* \* \* \*

" 'State legislatures, in too many instances, yielded to the necessities of their constituents, and passed laws by which creditors were compelled to wait for the payment of their just demands, on the tender of security, or to take property at a valuation, or paper money falsely purporting to be the representative of specie.' 3 Ramsey's Hist. of U. S., 77.

" *'The effect of these laws interfering between debtors and creditors were extensive. They destroyed public credit and confidence between man and man, injured the morals of the people, and in many instances insured and aggravated the ruin of the unfortunate debtors for whose temporary relief they were brought forward.'* 2 Ramsey's Hist. South Carolina, 429.

\* \* \* \* \*

"The treaty of peace with Great Britain declared that 'the creditors on either side shall meet with no lawful impediment to the recovery of the full amount in sterling money of all bona fide debts heretofore contracted.' The British minister complained earnestly to the American Secretary of State of violations of this guaranty. Twenty-two instances of laws in conflict with it in different States were specifically named. 1 Amer. State Papers, pp. 195, 196, 199, and 237. In South Carolina, 'laws were passed in which property of every kind was made a legal tender in payment of debts, although payable according to contract in gold and silver. Other laws installed the debts, so that of sums already due only a third, and afterwards only a fifth, was securable in law.' 2 Ramsey's Hist.

S. C., 429. Many other States passed laws of a similar character. The obligation of the contract was as often invaded after judgment as before. The attacks were quite as common and effective in one way as in the other. To meet these evils in their various phases, the national Constitution declared that 'no State should emit bills of credit, make any thing but gold and silver coin a legal tender in payment of debts, or pass any law * * * impairing the obligation of contracts.' All these provisions grew out of previous abuses. 2 Curtis Hist. of the Const., 366. See, also, the Federalist, Nos. 7 and 44. In the number last mentioned, Mr. Madison said that such laws were not only forbidden by the Constitution, but were 'contrary to the first principles of the social compact, and to every principle of sound legislation.'

"The treatment of the malady was severe, but the cure was complete.

\* \* \* \* \*

" 'Public credit was reanimated. The owners of property and holders of money freely parted with both, well knowing that no future law could impair the obligation of the contract.' 2 Ramsey's History of South Carolina, 433.

"Mr. Chief Justice Taney, in Bronson v. Kinzie (supra), speaking of the protection of the remedy, said 'It is this protection which the clause of the Constitution now in question mainly intended to secure.' "

In the case of Walker v. Whitehead, 16 Wall. (83 U. S.), 314, 318, the Supreme Court of the United States had before it a case involving the validity of the Georgia Act of 1870 passed in response to the destitute condition of the State brought about by the ravages of war, requiring all legal taxes due upon debts contracted before 1865 to be paid before judgments should be entered thereon, etc. The validity of this measure was sustained by the Supreme Court of Georgia because of the desperate financial and economic condition in the State following the Civil War, fully described in its opinion. (Walker v. Whitehead, 43 Ga., 538).

The Supreme Court of the United States, however, at the December Term, 1872, held the Act void, notwithstanding the emergency conditions prevailing at the time of its enactment.

From the foregoing and other authorities we have concluded that up to the time our Constitution was adopted in 1876, the Supreme Court of the United States had uniformly so interpreted the language of the contract clause of the Federal Constitution as to prohibit the enactment of the moratory legisla-

tion before us. This conclusion is supported by Mr. Freund, who in his work on the Police Power, sec. 557, states:

"The Federal constitution renders impossible many of the devices formerly resorted to by the soverign power to relieve debtors from existing obligations, such as the annulment of existing debts, the retroactive reduction of the rate of interest on loans, all stay and respite laws, and the retroactive operation of homestead and exemption laws."

The State courts, with a remarkable degree of unanimity, have stricken down many, if not all, types of stay and moratory legislation as violative of the contract clause of the Federal Constitution or of clauses of their own organic acts prohibiting the impairment of contracts.

Because of its length, we have placed the list of State cases, briefly classified, in the footnote on this and succeeding pages of this opinion[1].

In preparing the list of authorities in the notes below we have included some cases decided subsequent to 1876, the year, our Constitution was adopted, as well as those prior thereto, for the reason that both classes are authority against the validity of the measure here involved. The opinions rendered prior to the adoption of the Constitution are, of course, to be considered also for the purpose of showing the current judicial interpretation of the contract clause pior to and at the time of the adoption of our organic Act.

---

[1]STATE SUPREME COURT CASES AND OTHER AUTHORITIES HOLDING UNCONSTITUTION MORATORY ACTS BRIEFLY DESCRIBED: (In this list of cases the last date following each case is the year of the decision; the date or dates preceding are those of the void enactments)

*Acts granting or extending redemption periods:* People v. Hays, 4 Calif., 127 (1851-1854) ; Robinson v. Howe, 13 Wis., 341 (1852-1861) ; Hudgins v. Morrow, 47 Ark., 515 (1879-1886) ; Haynes v. Tredway, 133 Calif., 400, 65 Pac., 892 ( ? -1901) ; Wilder v. Campbell, 4 Idaho, 695, 43 Pac., 677 (1895-1896) ; Malony v. Fortune, 14 Iowa, 417 (1860-1862) ; Bixby v. Bailey, 11 Kan., 359 ( ? -1873) ; Ogden v. Walters, 12 Kan., 282 (1861-1873) ; Paris v. Nordburg, 6 Kan. App., 260, 51 Pac., 799 (1893-1897) ; Watkins v. Glenn, 55 Kan., 417, 40 Pac., 316 (1893-1897) ; State, etc., v. Gilliam, 18 Mont., 94 (1895-1896) ; Carroll v. Rossiter, 10 Minn., 174 (1861-1865) ; Goenen v. Schroeder, 8 Minn., 387 (1858-1863) ; Heyward v. Judd, 4 Minn., 483 (1860-1860) ; State v. Hurlburt, 93 Ore., 34, 182 Pac., 169 (1917-1919) ; State v. Sears, 29 Ore., 580, 46 Pac., 785 (1895-1896) ; Hollister v. Donahoe, 11 S. D., 497, 78 N. W., 959 (1893-1899) ; State ex rel. Cleveringa v. Klein, 249 N. W., 118 (North Dakota, 1933-1933) ; Page on Contracts (1st Ed.), Vol. 3, sec. 1777, and authorities in the notes; Elliott on Contracts, Vol. 3, p. 961, sec. 2752; id. p. 925, sec. 2732, and cases in the notes; id. Vol. 8, p. 458, sec. 2752, and authorities there cited; Jones on Mortgages (8th Ed.), Vol. 2, p. 1466, sec. 1337, and cases in the notes.

*Continuing suits until one year after peace, or for a definite time:* Burt v. Williams, 24 Ark., 91 (1862-1863) ; Martin v. Hewitt, 44 Ala., 418 (1868-1870).

*Prohibiting the judicial sale of property for less than its appraised value or a named percentage thereof:* Robards v. Brown, 40 Ark., 423 (1879-1883) ; Sheets v. Peabody, 7 Blackf., 613, 43 Am. Dec., 107 (Indiana, 1843-1845) ; Collins v. Collins,

Space does not permit an analysis of the State cases, except as shown in the margin hereof, but because of its relevancy to the historical review of the contract clause in the Federal Constitution, showing the purpose of that clause, and as demonstrating that emergency enactments impairing the obligation of contracts are not admissible under it, we will refer to one of the leading State cases at length.

In 1866 the Supreme Court of South Carolina, in the case of State v. Carew, 13 Richardson L. & E. Rep., 498, 520, 521, held that.

"so much of the Acts of 1861 and 1865, commonly called the Stay Law, as declares that it shall not be lawful for any officer to serve or execute mesne or final process for the collection of money, is void, because repugnant to the provision of the Constitution of the United States 'that no State shall pass any law impairing the obligation of contracts,' and the similar provision of the Constitution of this State."

In discussing the question involved, the Court said:

*"It may be that in great emergencies, in periods of general embarrassment, this extraordinary power of interfering for the relief of the citizen ought to have been reserved to the State Legislatures."* (Italics ours).

The Court then entered upon an inquiry as to whether or not such emergency legislation could be sustained under the contract clause of the Constitution, and *concluded it could not because*

---

79 Ky., 88 (1878-1880); Swinburne v. Mills, 17 Wash., 611, 50 Pac., 489, 61 Am. S. R., 932 (1897-1897); Elliott on Contracts, Vol. 3, p. 925, sec. 2732, and many cases cited in the notes; Wolf v. Heath, 7 Blackf., 154 (Indiana, ?-1844); Franklin v. Thurston, 8 Blackf., 160 (Indiana, 1843-1846); United States Supreme Court cases, supra.

*Prohibiting deficiency judgments:* Adams v. Spillyards, 187 Ark., 641, 61 S. W. (2d) 686, 86 A. L. R., 1493 (1933-1933); Burrows v. Vanderberg, 69 Neb., 43, 95 N. W., 57 (1897-1903); Dennis v. Moses, 18 Wash., 537, 40 L. R. A., 302, 52 Pac., 333 (1897-1898); 19 R. C. L., 669, sec. 485; Vanderbilt v. Brunton Piano Co., 111 N. J. L., 596, 169 Atl., 177 (1933-1933); Goldberg v. Fisher, 168 Atl., 232, 235 (N. J., 1933-1933).

*Prohibiting confirmation of judicial sales where property has not been sold for its fair value:* Rawley v. Hooker, 21 Ind., 144 (1843-1863); Adams v. Spillyards, 187 Ark., 641, 61 S. W. (2d) 686, 86 A. L. R., 1493 (1933-1933); Federal Land Bank v. Floyd, 187 Ark., 616, 61 S. W. (2d) 449 (1933-1933).

*Providing for payment of judgments in installments:* Aycock v. Martin, 37 Ga., 124, 92 Am. Dec., 56 (1866-1867); Jones on Mortgages (8th ed.), Vol. 3, sec. 1694.

*Staying for a certain time the delivery of deeds in judicial sales:* Scobey v. Gibson, 17 Indiana, 572, 79 Am. Dec., 490 (1861-1862).

*Decreasing or denying a previously existing redemption period:* Cargill v. Power, 1 Mich., 369 (1847-1850); Moore v. Irby, 69 Ark., 102, 61 S. W., 371 (1895-1901); Turk v. Mayberry, 32 Okla., 66, 121 Pac., 665 (1907-1912).

*Staying issuance of execution until twelve months after peace:* Hudspeth & Co. v. Davis, 41 Ala., 389 (1861-1867); Garlington v. Priest, 13 Fla., 559 (1861-1870).

*the very purpose of the prohibition against the impairment of contracts was to prevent such legislation.* In part, the court said:

"It remains only to inquire whether this particular matter was not fully considered by the framers of the Constitution. When Luther Martin, a delegate from Maryland, returned to his constituents, he was opposed to several provisions of the Constitution, which had been adopted, and thus expresses his dissatisfaction with the clause prohibiting the States from passing any low impairing the obligation of contracts."

(Here the court quoted the remarks of Luther Martin and the statement from Madison's introduction to the Convention debates, which we have previously copied in this opinion). The court then continued:

"General Davie, of North Carolina, returning from the Convention, congratulated his constituents on the adoption of this prohibition of the Constitution. That, hereafter, a sister State could not again do what they had heretofore done—'make Pine Barren Acts to discharge their debts; declare that our citizens shall be paid in sterile, inarable lands, at an extravagant price; pass instalment laws, procrastinating the payment of debts due from their citizens for years.' 'It is essential (said he) to the interests of agriculture and commerce that the hands of the State should be bound from making paper money. Instalment Laws and Pine Barren Acts.' 'That section is the best in the

*Increasing the statutory interest rate on redemption above that previously required by law:* Hillebert v. Porter, 28 Minn., 496, 11 N. W., 84 (1878-1881); Woodruff v. State, 3 Ark., 285 (1837-1841).

*Suspending the collection of debts for a limited time:* Coffman v. Bank of Kentucky, 40 Miss., 29, 90 Am. Dec., 311 (1861-1866); Barnes v. Barnes, 8 Jones (53 N. C.) 366 (1861-1863).

*Staying execution unless the creditor takes the property at a named percentage of its value:* Willard v. Longstreet, 2 Douglas (Mich.) 172 (1841-1845); Gentry v. Bailey, 1 Mo., 164 (1821-1822); Brown v. Ward, 1 Mo., 209 (1821-1822).

*Providing for stay of execution in justice courts of from one to four months:* Bumgardner v. Circuit Court, 4 Mo., 50 ( ? -1835).

*Making executions returnable to a later term of court:* Stevens v. Andrews, 31 Mo., 205 (1861-1861).

*Providing for stay of execution for a limited time upon debtor giving security:* Jones v. Crittenden, 4 N. C., 55, 6 Am. Dec., 531 (1812-1814); Ashurst v. Phillips, 43 Ala., 158 (1861-1869).

*Providing for the payment of amounts due under contracts in installments:* Jacobs v. Smallwood, 63 N. C., 112 (Acts 1866 and 1868, decision 1869).

*Staying the return on citation for ninety days:* Johnson v. Winslow, 64 N. C., 27 (1869-1870).

*Providing for stays of execution where majority or more of creditors agree:* Bunn, Raiguel & Co. v. Gorgas, 41 Pac. St., 441 (1861-1862); Miller v. Ripka, 9 Am. Law Reg. (O. S.) 561 (Pennsylvania, 1861-1861).

*Prohibiting the service of mesne or final process in judicial proceedings:* State v. Carew, 13 Rich. L. & E. Rep. (South Carolina) 498-506 (1861-1865-1868); Goggans v. Turnipseed, 1 S. C., 80, 98 Am. Dec., 397 (1861-1868).

Constitution. It is founded in the strongest principles of justice. It is a section, in short, which I thought would have endeared the Constitution to this country.' (4 Ell. Deb., 157, 159, 191).

"Mr. Charles Pinckney, of South Carolina, was a member of the Convention which adopted the Constitution of the United States in 1787. He was subsequently a member of the Convention which formed the State Constitution of 1790, and is said to have prepared the draft of the Constitution of South Carolina. In the debates of the State Convention, commenting on this clause of the Constitution of the United States (Article 1, Section 10), Mr. Pinckney said: 'This section I consider as the soul of the Constitution; as containing, in a few words, those restraints upon the States which, while they keep them from interfering with the powers of the Union, will leave them always in a situation to comply with their Federal duties; will teach them to cultivate the principles of public honor and private honesty, which are the sure road to national character and happiness.' The prohibition was reiterated in the State Constitution then adopted: 'Nor shall any law impairing the obligation of contracts ever be passed by the Legislature of this State.' (Article 9, Section 2).

"The venerable Chancellor DeSaussure had walked with those who fought in the Revolution, and with those who framed

*Suspending the jurisdiction of courts:* Wood v. Wood, 14 Richardson L. & E. Rep. (South Carolina) 148 (1866-1867); Barnes v. Barnes, 8 Jones' Law (53 N. C.) 366 (1861-1863).

*Staying sales under deeds of trust for a limited time:* Taylor v. Sterns, 18 Gratt., 244, 59 Va., 244 (1866-1868); Phinney v. Phinney, 81 Maine, 450, 17 Atl., 405, 4 L. R. A., 348 (1887-1889); Strand v. Griffith, 63 Wash., 334, 115 Pac., 512 (1897-1911); Jones on Mortgages (8th Ed.), Vol. 3, secs. 1693, 1694.

*Staying executions for a definite time:* Aycock v. Martin, 37 Ga., 124, 92 Am. Dec., 56 (1866-1867); Caldwell v. Sheffer, 8 Blackf., 117 (Indiana, 1842-1846); Strong v. Daniels, 5 Ind., 348 (1840-1854); Dormire v. Cogly, 8 Blackf. (Indiana) 177 (1842-1846); Blair v. Williams, 4 Litt. (Ky.) 34 (1820-1823); Lapsley v. Brashears, 4 Litt. (Ky.) 47, 1820-1823); Grayson v. Lilly, 7 T. B. Monroe, 6, 23 Ky., 10 (1820-1828); Stephenson v. Barnett, 7 T. B. Mon., 50, 23 Ky., 38 (1820-1828); McKinney v. Carroll, 5 T. B. Mon., 96, 21 Ky., 68 (1820-1827); Miller v. Gibson, 63 N. C., 635 (1869-1869); White v. Crawford, 84 Pa. St., 433 (?-1877); McClain v. Easly, 63 Tenn., 520 (1861-1874); Billmeyer v. Evans, 40 Pa. St., 324 (1861-1861); Lewis v. Lewis, 47 Pa. St., 127 (1861-1864); Townsend v. Townsend, 7 Tenn., 1, 14 Am. Dec., 722 (1819-1821); Webster v. Rose, 6 Heisk. (53 Tenn.) 93, 19 Am. Rep., 583 (1861-1871).

*Giving debtor possession and rents on foreclosed property until redemption period expires:* First National Bank v. Bovey et al., 49 N. D., 450, 191 N. W., 765 (1919-1922); Greenfield v. Dorris, 33 Tenn. (1 Sneed) 548 (1850-1853); Travelers' Ins. Co. v. Brouse, 83 Ind., 62 (1881-1882); Canadian v. Blake, 24 Wash., 102, 85 Am. St. Rep., 946, 63 Pac. 1100 (1899-1901).

*Postponing sales under foreclosure proceedings for a definite time:* Strand v. Griffith, 63 Wash., 334, 115 Pac., 512 (1897-1911); Jones on Mortgages (8th Ed.), Vol. 3, secs. 1693, 1694, and cases cited in the notes.

the Federal Constitution. The following is his note to Glaze v. Drayton (1 Des. R., 110): 'The Legislature, in consideration of the distressed state of the country after the war, had passed an Act prohibiting the immediate recovery of debts, and fixing certain periods for the payment of debts far beyond the periods fixed by the contract of the parties. These interferences with private contracts became very numerous with most of the State Legislatures, even after the distress arising from the war had ceased in a great degree. They produced distrust and irritation throughout the community to such an extent that new troubles were apprehended; and nothing contributed more to prepare the public mind for giving up a portion of the State sovereignty, and adopting an efficient national government, than these abuses of power by the State Legislatures.'

"In a similar strain, Mr. Justice Colcock speaks in Alexander v. Gibson, 1 Nott & McC. Rep., 186 (A. D. 1819): 'In giving construction to this part of the Constitution it is necessary to take a view of the state of things which existed at the time of its adoption, and of the particular Acts which had been passed by many of the States during the struggle for our independence. From the difficulties which had arisen during the war, it was found to be impossible for debtors to satisfy the demands of their creditors. The value of property was diminished. There was little circulating medium in the country. And hence had originated ('Pine Barren Acts,' 'Instalment Laws,' and other Acts of similar character, impairing the obligation

*Denying right to bring ejectment proceedings void as to mortgages executed when such right existed:* Blackwood v. Van Vlett, 11 Mich., 252 (1843-1863); Mundy v. Monroe, 1 Mich., 68 (1843-1848).

*Where the effect of an act is to interpose obstacles and delays to the enforcement of mortgages given before its passage it is void:* Oatman v. Bond, 15 Wis., 20 (1861-1862).

*Act making loan due before date agreed to in the contract can not be enforced:* Randolph v. Middleton, 26 N. J. Eq., 543 (1870-1875).

*Law limiting right to writ of garnishment void as to previously existing contracts:* Adams v. Creen, 100 Ala., 218, 14 So., 54 (1893-1893).

*Taking away right to foreclose under power of sale pursuant to statute existing at date of mortgage:* O'Brien v. Krenz, 36 Minn., 136, 30 N. W., 458 (1877-1886); Latham v. Whitehurst, 69 N. C., 33 (1868-1873).

*A law imposing new conditions of redemption on mortgagee which did not exist at date of contract:* Coddington v. Bispham, 36 N. J. Eq., 574 (1881-1883).

*An act prohibiting taking possession of property in accordance with pre-existing mortgage;* Boice v. Boice, 27 Mich., 371, 7 N. W., 687 (1879-1880).

*The Georgia Relief Act of 1870 making payment of taxes on debts contracted prior to June 1, 1865, condition precedent to recovery;* Mitchell v. Cothrans, 49 Ga., 125 (1870-1873); Gardner v. Jeter, 49 Ga., 195 (id.); Kimbro v. Bank, 49 Ga., 419 (id.).

*Act imposing registration of warrants as condition precedent to recovery held void as to pre-existing warrants:* Robinson v. Magee, 9 Calif., 81, 70 Am. Dec., 638 (1855-1858).

of contracts, and thereby destroying credit. Many of these laws were then in operation, and to guard against the continuance of them was the avowed object of this clause in the Constitution.'

"Such was the contemporaneous testimony; such has been the uniform tradition of the country. Laws of the character of those under consideration were precisely those against which the prohibition of the Constitution was directed. Perhaps our forefathers miscarried in judgment, and Luther Martin was right. But he failed to convince his constituents. The people of the several States acted with their eyes open. They set one thing over against another, and the counsels of General Davie, and Mr. Madison, and Mr. Pinckney, prevailed over the counsels of Mr. Martin and other distinguished patriots. They ratified the prohibition of the Constitution. They thus voluntarily submitted to this self-restraint, and determined to protect their representatives in the State Legislature from the perils of temptation. If there has been any authoritative adjudication since the adoption of the Constitution, sustaining the validity of 'Instalment Laws,' or 'Stay Laws,' it escaped the research of the learned counsel who argued this cause, and has not been brought to the notice of the Court." (Italics ours).

█ It is obvious from the foregoing that at the time the clause prohibiting the impairment of contracts was placed in the Texas Constitution in 1875-1876, the language employed had a fixed and definite meaning in the jurisprudence of the country, the effect of which was that moratory legislation of almost every conceivable type was void. Since we adopted the contract clause without change, it must be held that we likewise adopted the fixed and definite interpretation which had been given it by the coruts generally. 12 Corpus Juris, p. 717, secs. 69, 70; 6 Ruling Case Law, p. 54, sec. 49; 9 Texas Jurisprudence, p. 428, sec. 19.

The correctness of the conclusion just stated is consistent with the history of the subject in this State.

Section 16 of the Declaration (Bill) of Rights of the Constitution of the Republic of Texas adopted in 1836 declared: "*No* retrospective or ex-post facto, or *laws impairing the obligation of contract shall be made."* Vol. 4, Sayles Statutes (Constitutions) of Texas, page 175 (3d ed.).

Notwithstanding the depressions of 1837, 1857, the Civil War period, and the depression of 1873, this exact language became a part of our Bill of Rights in each succeeding constitution adopted respectively in 1845, 1861, 1866, 1869, and 1876. Vol.

4, Sayles Statutes (Constitutions), supra, pages 227, 288, 301, 503.

Prior to the incorporation of the contract clause in the Constitution of 1875-1876, the language used had been interpreted by the Supreme Court of this State as prohibiting moratory legislation.

The stay laws adopted by the Legislature during the Civil War period because of the depressed condition, and to relieve the grave emergencies of the time, among other things provided for the suspension of the collection of debts until after the ratification of peace and for the payment of judgments by installments. These Acts were held void because impairing the obligation of contracts in violation of the contract clause in the Constitution of the United States and the State Constitution of 1845. Luter v. Hunter, 30 Texas, 688 (1868); Canfield v. Hunter, 30 Texas, 712 (1868); Culbreath v. Hunter, 30 Texas, 713 (1868); Jones v. McMahan, 30 Texas, 719 (1868); Earle v. Johnson, 31 Texas, 164 (1868).

These decisions were subsequently cited with approval by the Supreme Court. Sessums v. Botts, 34 Texas, 335 (1870); Cravans v. Wilson, 35 Texas, 53 (1871); Grace v. Garnett, 38 Texas, 157 (1873).

The foregoing opinions of the Court were rendered during reconstruction days, but their correctness has never been questioned by this Court. On the contrary, at the Austin Term *in 1874*, at a time when the Court was a regularly organized constitutional court, composed of Oran M. Roberts, Chief Justice, and Reuben A. Reeves, Thomas J. Devine, George F. Moore, and Peter W. Gray, Associate Justices, the cases of Jones v. McMahon, 30 Texas, 719, Luter v. Hunter, 30 Texas, 688, were cited by the Court as settling the question that the stay laws of 1861-1866 were unconstitutional and void because they impaired the obligation of contracts. Black v. Epperson, 40 Texas, 162, 186 (1874). Subsequent to the adoption of the Constitution in 1876, the principal cases named above were again cited by this Court with approval in Cravens v. Wilson, 48 Texas, 324, 338 (1877), and Delespine v. Campbell, 52 Texas, 4 (1879).

■ The adoption of the contract clause of a previous Constitution, and its incorporation in the present organic law without change, after it had been interpreted by this Court, under a familiar rule carries with it the construction previously given it by this Court. 9 Texas Jurisprudence, p. 428, sec. 19, and cases cited in the notes; Hubbard v. Hamilton County, 113 Texas, 547,

261 S. W., 990; Robertson v. State, 63 Texas Crim. Rep., 216, 219, 142 S. W., 533; and authorities supra.

So, in view of the history of the adoption of the contract clause in the Federal Constitution, its incorporation in the organic laws of the several States, and the long judicial interpretation thereof by the Supreme Court of the United States, by the Supreme Courts of the several States, and by the Supreme Court of Texas prior to 1876 (the date of the adoption of our present Constitution), there is no doubt whatever but that Section 16 of our Bill of Rights (Art. 1 of the Constitution) prohibits the enactment of moratory legislation which impairs the obligation of contracts, even though enacted during an industrial depression, such as this country had previously suffered in 1819, 1837, 1857, 1861-1865, and 1873.

■ The Act before us purports to give relief to *debtors;* but were we to sustain its validity, the rule would apply with equal force to Acts giving relief to *creditors,* to the detriment of debtors. Many laws of this nature have been passed, but *creditors,* relief laws, like those for the relief of *debtors,* have been struck down because impairing the obligation of contracts. Cargill v. Power, 1 Mich., 369; Hillebert v. Porter, 28 Minn., 496; Robinson v. Howe, 13 Wis., 341; Wood v. Rosedale, 10 Ohio C. D., 66, 18 Ohio C. C., 247; Moore v. Irby, 69 Ark., 102, 61 S. W., 371; Ashuelot R. R. Co. v. Elliott, 52 N. H., 387; Martin v. Somerville W. P. Co., 27 Howard Practice (N. Y.), 161; Tuolumne Redemption Co. v. Sedgwick 15 Cal., 515; Moody v. Hoskins, 64 Miss., 468, 1 So., 622; Randolph v. Middleton, 26 N. J. Eq., 543; Woodruff v. State, 3 Ark., 285; Turk v. Mayberry, 32 Okla., 66, 121 Pac., 665; Elliott on Contracts, Vol. 3, secs. 2730, 2732; Jones on Mortgages (8th ed.), Vol. 3, sec. 1693; Vol. 2, sec. 1337.

■ The interpretation which we have given the contract clause is consistent with the rule in equity that the existence of depressed conditions, such as described in the preamble of the Act before us, presents no ground for enjoining the forced sale of property under valid contracts. Floore v. Morgan (Tex. Civ. App., 1915), 175 S. W., 737; Anderson v. White, 2 App. Cas. (D. C.), 408 (1894); Lipscomb v. N. Y. Life Ins. Co., 138 Mo., 17, 39 S. W., 465 (1897); Muller v. Stone, 84 Va., 834, 6 S. E., 223, 10 Am. St. Rep., 889 (1888); Muller v. Bayly, 21 Gratt. (62 Va.), 521 (1871); Caperton v. Landcraft, 3 W. Va., 540 (1869); Dunn v. McCoy, 150 Mo., 548, 52 S. W., 21 (1899); Bolich v. Insurance Company, 202 N. C., 789, 164 S. E., 335, 82

A. L. R., 974 (1833); 19 R. C. L., 618, sec. 434; Pomeroy's Equity Jurisprudence, Vol. 4, 404, sec. 1738.

■ The insistence that the law before us affects only the "remedy" and not the "obligation" of contracts is without merit. Langever v. Miller, decided today (post, p. 80), 76 S. W. (2d) 1025. In that case we have discussed the subject quite fully, and it is unnecessary to repeat what is there said.

It is obvious that the exercise of the powers specified in the statute before us is condemned by the rules announced in that case, as well as by the long line of authorities, State and National, previously cited in this opinion.

We have heretofore cited a long list of cases holding almost every conceivable form of stay law invalid. We direct particular attention to those which hold that Acts continuing suits for a definite time, suspending the collection of debts for a limited period, staying returns on citations, prohibiting the service of process, suspending the jurisdiction of courts, staying sales under deeds of trust, postponing sales under foreclosure, etc., are void because impairing the obligation of contracts. These cases are directly in point here, and further discussion seems unnecessary, particularly in view of the decisions of this Court holding the wartime stay laws unconstitutional.

■ The fact that the Moratory Act makes provision for ascertaining the rental value of the property involved (when it has any rental value), and the payment of the debtor's obligation therefrom, such as taxes and insurance, with residue to be applied on the mortgage indebtedness, does not relieve the Act of its constitutional infirmities. The court can not be authorized to make a contract for the parties, and its attempt to do so necessarily impairs the original obligation, in view of the authorities. The right to enter into lawful contracts is one of the guarantees of the Texas Constitution. This guarantee is one of the essential liberties of the citizen, and can not be nullified by legislative enactment empowering courts to substantially rewrite his agreements. 9 Texas Jurisprudence, p. 522, sec. 90, p. 543, sec. 108.

■ The rent cases: Block v. Hirsh, 256 U. S., 135; Marcus Brown Co. v. Feldman, 256 U. S., 170; Levy Leasing Co. v. Siegel, 258 U. S., 242, are of no value here. We are interpreting a provision of the Constitution of Texas which had its meaning fixed at the time of its adoption as a part of the organic law, and nothing said by any other court subsequent to its adoption can change the meaning of our contract clause, nor make it sub-

ject to the police power, in the fact of the Bill of Rights which declares it is not subject to that power. 12 Corpus Juris, p. 717, sec. 70; 6 Ruling Case Law, p. 54, sec. 49; Powell v. Spackman, 7 Idaho, 692, 65 Pac., 503, 54 L. R. A., 378.

On the whole, we have concluded that the Act before us is void. In answering the question certified we do not mean to say there are not other provisions of the State Constitution which it violates, but confine our answer to Section 16, Article 1, because it is only as to that section that the inquiry is made.

The Court of Civil Appeals is respectfully advised that Chapter 16, Acts of the Second Called Session of the 43d Legislature, generally known as the "Moratorium Act," violates Section 16 of Article 1 of the Constitution of Texas, which prohibits the enactment of laws impairing the obligation of contracts.

This case was heard by the Supreme Court and both sections of the Commission of Appeals sitting together, and I am requested to state that all concur in this decision.