

# THE ATTORNEY GENERAL
## OF TEXAS

### AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

September 30, 1958

Mr. Joe Carter
Executive Secretary
Texas Water Development Board
Austin 1, Texas

Opinion No. WW-506

Re: May the Texas Water Develop-
ment Board lawfully give
financial assistance to a
political subdivision for
the construction of a water
filtration or water treat-
ment plant when such plant
constitutes an integral
part of the entire water
project?

Dear Sir:

You have requested the opinion of the Attorney General
on the matter of whether the Texas Water Development Board may
legally loan funds to a water control and improvement district
for the purpose of the construction of a water treatment plant
. . . "when such plant constitutes an integral part of the en-
tire project."

We understand that a district seeks a loan of State
funds under applicable law so that it may construct a waterworks
system designed to take raw water from Lake Travis, render it
potable by filtration and distribute it to the consumers of the
district.

No problem is involved relative to the authority of a
water control and improvement district to do that which it seeks
to do. Article 7880-48, V.C.S.

The voters of the State on November 5, 1957, authorized
an Amendment to the Constitution known as Section 49-c of Article
III. Briefly, the amendment authorizes the sale of State Bonds
to provide an initial fund of $100,000,000.00 to be used to as-
sist named public corporations of the State in the conservation
and development of the water resources of Texas.

The portion of the Amendment applicable to this opinion follows:

"Such fund shall be used only for the purpose of aiding or making funds available upon such terms and conditions as the Legislature may prescribe, to the various political subdivisions or bodies politic and corporate of the State of Texas including river authorities, conservation and reclamation districts created or organized or authorized to be created or organized under Article XVI, Section 59, or Article III, Section 52, of this Constitution, interstate compact commissions to which the State of Texas is a party and municipal corporations, in the conservation and development of the water resources of this State, including the control, storing and preservation of its storm and flood waters and the waters of its rivers and streams, for all useful and lawful purposes by the acquisition, improvement, extension, or construction of dams, reservoirs and other water storage projects, including any system necessary for the transportation of water from storage to points of treatment and/or distribution, including facilities for transporting water therefrom to wholesale purchasers, or for any one or more of such purposes or methods."

Chapter 425, Acts 55th Legislature, R.S., 1957 (Article 8280-9, V.C.S.) is the enabling act for the Amendment. Therein the Legislature defines the word "project" as

". . . any engineering undertaking or work for the purpose of the conservation and development of the surface water resources of the State of Texas, including the control, storing and preservation of its storm and flood waters and the waters of its rivers and streams for all useful and lawful purposes by the acquisition, improvement, extension or construction of dams, reservoirs and other water storage projects, <u>filtration and water treatment plants</u> including any system necessary

for the transportation of water from storage
to points of distribution, or from storage to
filtration and treatment plants, including
facilities for transporting water therefrom
to wholesale purchasers, or for any one or
more of such purposes or methods." (Under-
scoring ours)

The Legislature deemed the Amendment broad enough to
include the construction of filtration and water treatment
plants as a part of a system that conserves and develops the
water resources of the State.

The enabling act was anticipatory. It was approved by
the Legislature June 6, 1957. The proposed amendment known as
H.J.R. No. 3, Acts 55th Legislature, R.S., 1957, was approved by
the same Legislature on June 6, 1957.

The legal effect of the legislative interpretation is
assayed in Collingsworth County v. Allred, 120 Tex. 473, 40 S.W.
2d 13, 16:

"Contemporaneous legislative interpretation
of a constitutional provision is universally
held to be entitled to weight . . ."

In Corsicana Cotton Mills v. Sheppard, 123 Tex. 352, 71
S.W. 2d 247, 251, the Court cautions:

"A legislative act which is in conflict with
the Constitution is stillborn and of no force
or effect - impotent alike to confer rights
or to afford protection."

Consequently, we are bound to consider whether there is
conflict between the enabling legislation and the organic law.

"The fundamental purpose in construing a con-
stitutional provision is to ascertain and give
effect to the intent of the framers and of the
people who adopted it." Collingsworth County v.
Allred, 120 Tex. 473, 40 S.W. 2d 13, 15.

> "Generally it may be said that in determining
> the meaning, intent, and purpose of a law or
> constitutional provision, the history of the
> times out of which it grew, and to which it
> may be rationally supposed to bear some direct
> relationship, the evils intended to be remedied,
> and the good to be accomplished, are proper sub-
> jects of inquiry." Travelers' Ins. Co. v. Mar-
> shall, 124 Tex. 45, 76 S.W. 2d 1007, 1012; 96
> ALR 802.

The historical background enveloping the framing and
enactment of the Amendment is a harsh one reflecting as it does
the longest drouth in the recorded history of the State. Be-
ginning in 1951 and continuing into April - May, 1957 the years
of drouth were disastrous, bitter alike to rural and metropoli-
tan areas. They were years of physical and economic stress well
calculated to implant in the mind of those exposed to its rigors
that water and the water resources of the State were assets to
be conserved and developed. It was in the final year of drouth
that the electors of the State voted the Amendment into the
Constitution.

The question is whether a filtration plant constituting
"an integral part of the entire water project" is within the
spirit and scope of the Amendment?

When the Amendment was drafted and at the time it was
voted upon, there existed Texas law on the treatment of water
and the purity thereof. Those who drafted the Amendment were
bound to have had cognizance thereof; those who voted it into
law are chargeable with knowledge thereof.

Article 4477-1, V.C.S., provides:

> "Section 12(a). Every person, firm, corporation,
> public or private, contemplating the establishment
> of any drinking water supply . . . for public use
> shall, previous to the construction thereof, submit
> completed plans and specifications therefor to the
> State Department of Health and the said Department
> shall approve same; provided said plans conform to

the water safety . . . laws of this State.
The said water supply . . . system shall
be established only after approval has been
given by the State Department of Health."

Article 4418d, V.C.S., confers certain rule making powers on the Commissioner of Health. Section C 4.00 of the "Rules and Regulations Covering the Preparation, Submission and Approval of Plans and Specifications for Water Supply Systems and Acceptable Operating Practices, Texas State Department of Health" provides:

"All water secured from surface sources of
supply shall be given complete treatment at
a plant which provides facilities for con-
tinuous coagulation, sedimentation, filtra-
tion through acceptable media, covered clear
well storage and continuous disinfection of
the water with chlorine gas or suitable chlo-
rine compounds."

Article 4477-1, Section 13 (f) gives the above rule the teeth of law in that:

"No water from any surface public drinking
water supply shall be made accessible or
delivered to any consumer for drinking pur-
poses unless it has first received treatment
essential to rendering it safe for human con-
sumption. All treatment plants including
aeration, coagulation, mixing, settling fil-
tration, and chlorinating units shall be of
such size and type as may be prescribed by
good public health engineering practices."

Article 7471, V.C.S., contains a declaration of policy relative the appropriation of the public waters of the State. The number one and highest priority granted is for "Domestic and Municipal uses, including water for sustaining human life and the life of domestic animals."

The fact is that surface water, as available in Nature, may be so colored, turbid, hard or contaminated as to be unfit for either domestic or industrial use. See "Waterworks Handbook" by Flinn, Weston and Bogert, and "Water Works Practice," a manual issued by the American Water Works Association.

By a series of processes generically designated as water treatment the raw water may be restored to a condition of usefulness. Filtration is one such process. See authorities next above.

Here, for convenience, we will paraphrase Section 49-c of Article III, Constitution of Texas:

> The fund may be used only for the purpose of aiding in a designated manner the named public corporations in the conservation and development of the State's water resources which shall include the control, storing and preservation of waters derived from storms, floods, rivers and streams by the acquisition, improvement, extension, or construction of dams, reservoirs and other water storage projects "including any system necessary for the transportation of water from storage to points of treatment and/or distribution, including facilities for transporting water therefrom to wholesale purchasers, or for any one or more of such purposes or methods." (Emphasis added)

The underscored portion first above might be construed to mean that the fund could be used to assist in the construction of a system to convey water from storage to a point of treatment, and, therefrom to wholesale purchasers. That construction of the Amendment would preclude the use of the fund to assist in any manner with the construction of a treatment plant.

The purpose prompting the amendment was a bold attempt to meet the water problems of the State and that legitimate purpose should not be defeated, hindered or frittered away by narrow or technical construction. Aransas County v. Coleman-Fulton Pasture Co., 108 Tex. 223, 191 S.W. 553; Imperial Irrigation Co. v. Jayne, 104 Tex. 395, 138 S.W. 575.

It is our opinion that a fair interpretation of the language, spirit and intent of the Amendment would be that the construction of a treatment plant was included. Certainly it can be said that if it was the intent of the framers to expressly exclude such plants, much has been left to chance. Matters of such importance should not be read out of the obviously broad scope of the Amendment on the strength of such a nebulous indication of negative intent.

> "It is a proper inquiry . . . in ascertaining whether a certain interpretation should be given to the language of the Constitution, to consider whether its framers and the voters by whom it was adopted intended the consequences which must follow such interpretation." Koy v. Schneider, 110 Tex. 369, 218 S.W. 479, 481.

Some practical "consequences" of the exclusion of treatment plants are these. The State could assist a city or town in developing a water source but could not aid it in rendering such water fit for use by treating it in compliance with the laws sponsored and enforced by the assisting sovereignty. Also, the assistance is in the nature of loans that must be repaid. If the water can not be used, it can not be sold and thereby earn the income necessary to repay the loan from the State. Further, a city or town with an existing treatment plant could avail itself of the benefits of the Amendment; whereas, a municipality that had no plant and could not finance the construction of one without such assistance as is contemplated by the Amendment, would be, as a practical matter, denied the benefit of stored water because it lacked treatment facilities. We do not believe that such inequities between municipalities similarly situated were intended by either the framers of the Amendment or those who voted it into being.

> "When a statute is plain and unambiguous in its terms and not susceptible of more than one construction, courts are not concerned with the consequences that may result therefrom, but must enforce the law as they find it. But when a statute is ambiguous in its terms or susceptible

of two constructions, then the evil results and hardships which may follow one construction may be properly considered by the court, and it is right that the court shall place upon the statute that interpretation of which it is fairly susceptible, which will attain the just solution of the questions involved and protect the rights of all parties." Oriental Hotel Co. v. Griffiths, 88 Tex. 574, 33 S.W. 652, 53 Am. St. Rep. 790, 30 LRA 765.

Generally speaking, rules of statutory construction are equally applicable to the construction of a Constitution. Badger v. Hoidale [C.C.A., 8th), 88 F. (2d) 208, 109 ALR 798, 11 Am. Jur., Sec. 49, pa 658.

Therefore, because of the reasons heretofore set out it is the opinion of the Attorney General that the Texas Water Development Board may lawfully grant financial assistance to a political subdivision, otherwise qualifying, for the purpose of constructing a water filtration plant when such project constitutes an integral part of the entire water project.

However, it is not our intent, nor do we hold, that under the provisions of Section 49-c, Article III, Constitution of Texas, the fund may be used in the construction of water treatment plants alone, not a necessary part of a system, but as an independent or exclusive undertaking.

## SUMMARY

The Texas Water Development Board may lawfully grant financial assistance to a political subdivision, otherwise qualifying, for the purpose of constructing a water filtration plant when such project constitutes an integral part of the entire water project.

Yours very truly,

WILL WILSON
Attorney General of Texas

By
Grundy Williams
Assistant

GW-s

APPROVED:

OPINION COMMITTEE

Geo. P. Blackburn, Chairman
L. P. Lollar
C. K. Richards
J. C. Davis, Jr.
Arthur Sandlin

REVIEWED FOR THE ATTORNEY GENERAL
BY: W. V. Geppert